## RE: THE ASSESSMENT OF SHARES OF STOCK OF THE KANAWNA VALLEY BANK

(No. 10952)

Submitted January 21, 1959.     Decided April 28, 1959.

HAYMOND, BERRY, JUDGES, dissenting.

*Jackson, Kelly, Holt & O'Farrell, James K. Brown, Homer A. Holt,* for plaintiff in error.

*W. W. Barron,* Attorney General, *Henry C. Bias, Jr.,* Assistant Attorney General, *D. Boone Dawson,* for defendant in error.

*John C. Morrison,* and *John S. Stump, Jr.,* amicus curiae on behalf of West Virginia Bankers Ass'n.

BROWNING, JUDGE:

This is a statutory appeal from a judgment of the Circuit Court of Kanawha County under the provisions of Code, 11-3-25, as amended, by the taxpayer, The Kanawha Valley Bank, a corporation, by which the trial court found that the true and actual value of the taxpayer's fifteen thousand shares of capital stock was $6,000,000.00, and assessed such shares at that amount for the purpose of levying an ad valorem tax thereon. On June 17, 1958, in a four to one decision of this Court,

the judgment of the Circuit Court of Kanawha County was reversed and the case remanded to that court. On the 15th of December, 1958, upon petition of counsel for the taxing units of government affected, a rehearing was granted, two of the Judges of this Court being noted as voting to refuse the rehearing. The case was rebriefed, reargued and again submitted for decision on January 21, 1959. Although such a proceeding is on the law side, it is by statute, designated an "appeal", and the parties will sometimes be referred to as appellant and appellees. The Assessor of Kanawha County had fixed the assessed value of these shares at $7,700,000.00. Upon an application for relief to the County Court of Kanawha County under the provisions of Code, 11-3-24, as amended, the County Court, sitting and acting as a board of equalization and review, heard testimony upon the contention of the taxpayer that the assessment was excessive, and that its stock had been assessed at one hundred per cent of its true and actual value, whereas other species of property in Kanawha County had been assessed at a lower percentage of its true and actual value, but denied the relief sought declaring by order "that the assessment in all respects is correct * * *." The trial court, pursuant to the authority vested in it by the provisions of Code, 11-3-25, as amended, by which it is empowered to review such an order of the County Court in a judicial capacity, and is also required to act in an administrative capacity and make such assessment as it believes is indicated upon the record made before the County Court, reduced the value of the shares for assessment purposes from $7,700,000.00 to $6,000,000.00, but refused to lower the percentage of the true and actual value of the property for assessment purposes "at a lower percentage in accordance with the practice of the Assessor in using such lower percentages in assessing other species of property." The trial court found that both the Assessor and the County Court had erroneously used the "book value" method alone as the means of ascertaining the true and actual value of the stock of the taxpayer, which procedure had been followed by the As-

sessor pursuant to instructions from the State Tax Commissioner, whereas this Court had held in *In Re: Tax Assessments Against the National Bank of West Virginia At Wheeling and The Morris Plan Savings and Loan Company*, 137 W. Va. 673, 73 S. E. 2d 655, that such method of ascertaining the true and actual value of shares of stock of banking institutions, standing alone, was contrary to the provisions of Code, 11-3-14, as amended, which deals with assessments for ad valorem taxing of stock of banking institutions, national banking associations and industrial companies. Although the final order of the trial court shows that the "State of West Virginia, the County of Kanawha, and Charleston Magisterial District and all other magisterial districts thereof concerned, jointly and severally, by counsel, excepted; * * *.", to the ruling by which the true and actual value of the shares of stock of petitioner was reduced from $7,700,000.00 to $6,000,000.00, no appeal was perfected by these governmental units from such action, and the taxpayer makes no complaint upon its appeal to the trial court's action in fixing the value of its shares of stock for the purpose of levying a tax thereon at $6,000,-000.00. The trial court, in refusing to fix the value of the stock for assessment purposes at less than one hundred per cent of its true and actual value, pursuant to the taxpayer's contention that the evidence established that the Assessor had arbitrarily assessed other species of property in Kanawha County for taxation purposes at a percentage less than its true and actual value in contravention of the provisions of Section 1, Article X, of the Constitution of West Virginia, cited, as authority for its refusal to do so, decisions of this Court.

Thus the sole issue for determination by this Court is whether the trial court erred in holding that this taxpayer suffered a constitutional discrimination by having its property assessed for the payment of ad valorem taxes upon the basis of one hundred per cent of its true and actual value. The burden of establishing that fact was upon the taxpayer, and, unless that discrimination is shown by the evidence, the taxpayer cannot invoke

the provisions of the Constitution or any statutory enactment. The provision of Section 1, Article X, of the Constitution, insofar as pertinent for consideration of that question, reads: "Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value; * * *."

Code, 11-3-1, as amended, provides that: "All property shall be assessed annually as of the first day of January at its true and actual value; * * *." The verbatim language of this Section first appeared in the Acts of 1933, however, similar language had been used previously thereto and the substance has remained unchanged since Chapter 118, Acts of the Legislature, Regular Session, 1863.

This taxpayer can make no complaint of discrimination because property of the same species in Kanawha County is not assessed for taxation purposes in the same manner that its property is assessed. The record is clear that the stock of all other banking institutions in Kanawha County, and, indeed, in the State, with one possible exception, is assessed for taxation purposes at one hundred per cent of its true and actual value.

John M. Slack, Jr., at the time Assessor of Kanawha County, and now Congressman from the Sixth West Virginia Congressional District, testified at the hearing before the County Court. He was asked these questions and made these answers:

Q: "Having arrived at a value by the book value method, what percentage of that true and actual value have you assessed the stock?"

A: "One hundred per cent."

Q: "What percentage of true and actual value have you assessed other property in Kanawha County for the year 1957?"

A: "We have made an attempt to assess it at 40 per cent, according to Senate Bill 3."

Q: "Have you made any effort to assess other property in Kanawha County at 100 per cent of its true and actual value?" -

A: "None other than Class 1 property, and that, of course, we inherited from procedure carried on in the past. * * *"

"* * *"

COMMISSIONER GLENN: "The question in my mind was whether it was clear that Class 1 property is all assessed at 100 per cent."

THE WITNESS: "Cash on hand and money in the bank at 100 per cent, accounts receivable at 60 per cent, notes receivable at about 60 per cent, and the way you determine that is how they are supported, by deed of trust, security and so forth."

"* * *"

Q: "Do you know what percentage of true and actual value livestock is assessed at?"

A: "Frankly, I don't."

Q: "Is it very low?"

A: "It is very low."

Q: "Then as I understand, you have used less than 100 per cent of true and actual value in other classes of propertry?"

A: "Yes, in case of inventories we assess inventories at 50 per cent. We assess machinery and equipment at 20 per cent of the original cost. We find that by using this method we come up with nearer the same figure that the Tax Commissioner uses in arriving at his values for State aid purposes."

Q: "And real estate, what percentage of the true and actual value?"

A: "Of course, we have a gross inequality there, according to the State Tax Commissioner

our real estate runs from something like 9 to 130 per cent. As far as I know we are placing all real estate on the books at not less than 40 per cent of the Tax Commissioner's appraisal, in order to qualify for State aid."

Q: "Would you consider that not less than 40 per cent of true and actual value?"

A: "No, it is 40 per cent of the State Tax Commissioner's appraisal, and he is basing his appraisal upon 1950 costs, which he states is about 25 per cent less than costs would be on today's market."

Q: "Do you consider that you are assessing real estate on the average in Kanawha County at 100 per cent of true and actual value?"

A: "I do not."

Q: "At about what percentage of true and actual value would you estimate you are assessing it?"

A: "There again we go back to the survey of the State Tax Commissioner, and he claims it is about 35 per cent of his appraisal, which would be 25 per cent less than the value as of 1957. Senate Bill 3 refers to true and actual value. However, for purposes of this survey the Tax Commissioner's Property Evaluation Department is using replacement costs less depreciation, and they are based upon 1950 replacement costs, and according to them the replacement costs have increased from 1950 to 1957 by some 25 per cent."

Q: "Then would that mean that if you were assessing at 40 per cent of the 1950 value that you would actually be assessing real estate at less than 40 per cent of the true and actual value today?"

A: "I would say it would, yes."

"Senate Bill 3" to which the witness refers is Chapter 1, Acts of the Legislature, 1955, First Extraordinary Session, which provides that a county cannot be eligible for

its full allocation of State aid for schools for the year 1957 unless for that year the assessed valuation of non-utility property in such county for taxation purposes is not less than forty per cent of the appraised valuation of such property as determined by the Tax Commissioner, based upon true and actual value.

It is clear beyond doubt from this witness' testimony that no species of property in Kanawha County was assessed for the year 1957 for taxation purposes at one hundred per cent of its true and actual value except bank stock and "money in the bank". In November, 1958, the people of this State by their vote amended Section 1, Article X, of the Constitution, to exempt bank deposits from taxation. It is also clear from his testimony that each and every species of property subject to ad valorem taxes situate in Kanawha County, with the exceptions above noted, and real property in particular, was by a preconceived plan assessed for taxation purposes at less than its true and actual value. The only question that remains for determination is whether such a scheme of taxation is in violation of Section 1, Article X, of the Constitution.

Counsel for the taxing units say that that question has already been decided by this Court, cite several cases in support of this contention, and invoke the rule of *stare decisis*. As a prelude to a consideration of these cases, it should be noted that the first of them was not decided until 1896, whereas the Constitution of this State became operative on June 20, 1863, and on July 28, 1868, the XIV Amendment to the Constitution of the United States was adopted. There was an Amendment to the pertinent Section of our Constitution in 1872, and thereafter it read as follows: "Taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property, from which a tax may be collected, shall be taxed higher than any other species of property of equal value; but property used for educational, lit-

erary, scientific, religious or charitable purposes; all cemeteries and public property, may, by law, be exempted from taxation. The legislature shall have power to tax, by uniform and equal laws, all privileges and franchises of persons and corporations." The word "cemeteries" and the last sentence were added by the Amendment, otherwise the Section is the same as provided in the Constitution of 1863.

Section 1 of the XIV Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In *Charleston & S. Bridge Co.* v. *Kanawha County Court*, 41 W. Va. 658, 24 S. E. 1002, error dismissed 168 U. S. 704, 42 L. Ed. 1212, 18 Sup. Ct. 941, decided March 21, 1896, the owners of a toll bridge in Kanawha County had filed a petition with the County Court praying for the correction of an erroneous assessment of its bridge for the year 1893, alleging that for the year 1892 the bridge was assessed at $22,000.00, and that the same property in the following year was "assessed upon the personal property books of said county" at $50,000.00. The County Court dismissed the petition, but the Circuit Court upon appeal reduced the assessment to $25,000.00, and ordered that the property be placed upon the land books since it was real property. This Court reversed the Circuit Court, directed that the property be placed on the personal property books, and affirmed the "judgment of the County Court." In the opinion, the Court said: "* * * The manner of ascertaining the valuation of a toll bridge is plainly prescribed in section 63 of chapter 29 of the Code. The assessor is thereby required to ascertain a just estimate of its annual value, and, for the purposes of tax-

ation, said statute provides that the value of a toll bridge or a ferry shall be taken to be ten times its annual value. This application was to correct the assessment of this bridge at fifty thousand dollars, yet, so far as the transcript and bill of exceptions show, no witness was offered to prove the annual value of said bridge; * * *." As to the contention that Section 63 of Chapter 29 of the Code, providing for the ascertainment of the value of the bridge for assessment purposes was unconstitutional, the Court said: "* * * In what respect is said section unconstitutional? Article X, s.l, of our Constitution provides that 'taxation shall be equal and uniform throughout the state, and all property, real and personal, shall be taxed in proportion to its value, to be ascertained as directed by law'; [The following provision that: "No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value.", is omitted, and the opinion continues] and this section concludes as follows: 'The legislature shall have power to tax, by uniform and equal laws, all privileges and franchises of persons and corporations.' Section 63 of chapter 29 was passed in pursuance of this provision, having for its object the proper assessment of toll bridges and their franchises and privileges, and for that reason directs the assessor to ascertain the annual value, which would be unnecessary if the bridge itself was to be taxed as real estate. This provision plainly confers upon the legislature the power of directing how the value of such franchises shall be ascertained, and to ascertain such value in any other mode than that directed by the legislature would surely be in violation of this constitutional provision, unless the mode prescribed by the statute should violate the clause requiring taxation to be equal and uniform throughout the state. As we understand it, this means that the same species of property throughout the state should be assessed at the same rate, according to its value, which is to be ascertained as required by law; that is, all of the toll bridges (taking this case for illustration) throughout the state must be assessed, and their values ascertained by mak-

ing a just estimate of the annual value of each, and multiplying it by ten. * * *" The opinion then proceeds to discuss and quote from a decision of the United State Supreme Court and a decision of the Supreme Court of Appeals of Virginia to the effect that, under the Constitution of the United States and the Constitution of the State of Virginia, a state law for the valuation of property and the assessment of taxes thereon, which provides for the classification of property into different classes, is valid. In translating this principle of law into the Syllabus, Point 4 thereof reads: "A tax upon all business of the same class, which is uniform as to that kind of business, is not unconstitutional." But cf. *Franklin Insurance Co.* v. *The State*, 5 W. Va. 349. It is to be observed that no question was raised in this case as to any other species of property, real or personal, being assessed for taxation purposes at a different per centum of its true and actual value. For that reason, the pertinent provision of Section 1, Article X, that no one species of property shall be taxed higher than any other species of property of equal value, was neither quoted nor discussed. Furthermore, there was not at that time, and there is not now, any prohibition against the taxing of any "business" other than "taxation shall be equal and uniform throughout the state." The provisions of that Section which purport to prohibit one species of property from being taxed higher than any other species relate only to property.

The next pertinent decision of this Court is *West Penn Power Company et al.* v. *Board of Review and Equalization of Brooke County*, 112 W. Va. 442, 164 S. E. 862. Perhaps it should be pointed out that appellees do not rely upon the decision of this Court in that case, but, on the contrary, the appellant avers that the decision supports its views. The Power Company complained that its property was assessed in excess of its true and actual value, and that, although its real property was assessed at one hundred per cent of its true and actual value, other real property in Brooke County was assessed at only eighty per cent of such value. The trial court denied

the Power Company relief, but this Court reversed that finding, and remanded the proceeding with directions that the Power Company's assessment "of real estate and improvements be reduced twenty per centum" to conform with the valuation of other property in that county for the levying of ad valorem taxes. This relief was accorded the taxpayer solely under the provisions of the XIV Amendment to the Constitution of the United States. Section 1, Article X, of our Constitution, was not mentioned in the opinion. The rule laid down in *Sioux City Bridge Co.* v. *Dakota County,* (Neb.) 260 U. S. 441, 67 L. Ed. 340, 43 Sup. Ct. 190, 28 A.L.R. 979, and of several state courts, the decisions of which are cited in the opinion, that, when a taxpayer is taxed at one hundred per cent of the true and actual value of his property and other taxpayers are taxed upon a lesser valuation, the remedy of the taxpayer who has been discriminated against is to have his valuation reduced, was recognized and adopted.

*Christopher* v. *James, Tax Commissioner,* 122 W. Va. 665, 12 S. E. 2d 813, was decided while there was in force in this State an income tax law. The taxpayer Christopher sought relief from a deficiency tax assessment laid by the State Tax Commissioner against the taxpayer on account of his income for the year 1937. The taxpayer had deducted from his gross income taxes paid to the Federal Government under the Social Security Act, the Bituminous Coal Act of 1937, and to the State of West Virginia under the Unemployment Insurance and Gross Sales Acts. This Court held that such deductions could not be made under the law then in effect, reversed the trial court and dismissed the petition. Near the end of the opinion, without any statement theretofore to indicate upon what it was based, appears this paragraph: "The taxpayer also draws into consideration the constitutional requirement of 'equal and uniform' taxation. Constitution of West Virginia, Art. X, Sec. 1. That provision means merely that as to classes of property, businesses or incomes there shall be uniformity of taxation. 'A tax upon all business of the

same class, which is uniform as to that kind of business, is not unconstitutional.' *Charleston & S. Bridge Co.* v. *County Court,* 41 W. Va. 658, 24 S. E. 1002." The single syllabus point makes no reference to any provision of the Constitution of this State.

At the general election in November, 1932, the voters of this State ratified an amendment to Section 1, Article X, of the Constitution, usually referred to as the Tax Limitation Amendment. After the amendment was adopted, Section 1, Article X, insofar as pertinent, read as follows: "Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value; except that the aggregate of taxes assessed in any one year upon personal property employed exclusively in agriculture, including horticulture and grazing, products of agriculture as above defined, including live stock, while owned by the producer, and money, notes, bonds, bills and accounts receivable, stocks and other similar intangible personal property shall not exceed fifty cents on each one hundred dollars of value thereon and upon all property owned, used and occupied by the owner thereof exclusively for residential purposes and upon farms occupied and cultivated by their owners or bona-fide tenants one dollar; and upon all other property situated outside of municipalities, one dollar and fifty cents; and upon all other such property situated within municipalities, two dollars; * * *." Pursuant to this Amendment, the Legislature, by Chapter 38, Acts of the Legislature, Regular Session, 1933, and by subsequent Amendments in 1933 and 1939, not here pertinent, enacted the following statute:

"Classification of Property for Levy Purposes. —For the purpose of levies property shall be classified as follows:

"Class I. All tangible personal property em-

ployed exclusively in agriculture, including horticulture and grazing;

"All products of agriculture (including livestock) while owned by the producer;

"All moneys and all notes, bonds, bills and accounts receivable, stocks and any other intangible personal property;

"Class II. All property owned, used and occupied by the owner exclusively for residential purposes;

"All farms, including land used for horticulture and grazing, occupied and cultivated by their owners or bona fide tenants;

"Class III. All real and personal property situated outside of municipalities, exclusive of classes I and II;

"Class IV. All real and personal property situated inside of municipalities, exclusive of classes I and II."

Thereafter, in 1943, this Court decided the case of *In Re: Tax Assessments Against Hancock County Federal Savings and Loan Association*, 125 W. Va. 426, 25 S. E. 2d 543. The principal question for determination in that case, and the only one to which the two syllabus points are directed, was the interpretation of Section 14-a, Article 3, Chapter 118, Acts of the Legislature, 1939, Michie's 1955 Code, §683(1), relating to the assessment for the purpose of taxation of the property of building and loan associations and federal savings and loan associations. This was a three to two decision, two of the Judges of the Court writing separate dissents, and in neither of the dissenting opinions is there any reference to certain quotations from the majority opinion which will be set out herein. After quoting the statute and discussing its provisions, the Court said:

"* * * We hold that the assessor properly included in his assessment of the association's property the sum of $650,903.35 covering the reported value of the association's surplus, un-

divided profits, reserves and uncollected interests.

"We are fortified in our conclusion by a study of the constitutional provisions relating to taxation which have guided us from the foundation of the state. That all property, both real and personal, shall be assessed, is one of the fixed stars in our system of taxation will be disclosed below."

Immediately thereafter appears pertinent quotations from Section 1, Article VIII, of the Constitution of 1863, Section 1, Article X, of the Constitution of 1872, and Section 1, Article X, as amended by the Tax Limitation Amendment of 1932. That part of Section 1, Article X, of the Constitution, which, since the Constitution of 1863, has provided that: "* * * No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value; * * *.", for the second time made its way into an opinion of this Court, and, furthermore, on one page it was quoted three times. The first such case will be discussed later in this opinion. On the following page, the Court said: "The contention that we should reduce the assessment of the association's property because, as contended, certain property of other classes, particularly real estate, is assessed at something less than its true and actual value is without merit. In *West Penn Power Co.* v. *Board of Review,* 112 W. Va. 442, 164 S. E. 862, it was held, in effect, that a taxpayer was entitled to have his property assessment reduced to the level at which other property of the same class was assessed in the same governmental unit. It will be noted that this decision applies to property of the same class. It does not appear that *intangible property* in Hancock County is assessed at less than its true and actual value. There is, therefore, no basis for the application of the rule laid down in the *West Penn* case. This question was raised in *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813, 816, and it was stated in the body of the opinion that the requirement of equal and uniform taxation set out in Section 1, Article X of our Constitution 'means merely that as to

classes of property, businesses or incomes there shall be uniformity of taxation.' See also, *Bistor* v. *McDonough*, 348 Ill. 624, 181, N. E. 417; *People* v. *Telephone Co.*, 277 Ill. 303, 36 N. E. 2d 362." (Italics supplied.) *Charleston & S. Bridge Company* v. *Kanawha County Court, supra,* was not cited. An examination of the two Illinois cases shows, that while they may support and approve the proposition for which they were cited, however, and bearing in mind that the Constitution of Illinois contains no "no one species" provision, the court in the *Bistor* case stated: "* * * Under our successive Constitutions uniformity of taxation has been and is a mandate to the taxing authorities and lies at the foundation of all taxing power. People v. Orvis, 301 Ill. 350, 133 N. E. 787, 24 A.L.R. 325. This rule of uniformity requires that one person shall not be compelled to pay a greater proportion of the taxes, according to the value of his property, than another. [Citing cases.] Uniformity in taxing implies equality in the burden of taxation; and this equality cannot exist without uniformity in the basis of assessment, as well as in the rate of taxation. * * *" A later Illinois case, *People ex rel. Ross, County Collector* v. *Chicago, B. & Q. R. Co.*, 381 Ill. 374, 45 N. E. 2d 633, applied these principles, the first head note stating: "Where the average equalized assessed valuation of railroad property throughout the state was fixed at 35 per cent. of its total value, taxes extended in one county on an equalized assessed valuation in excess of 35 per cent. were excessive and illegal." In that case, the Illinois Tax Commission had assessed the full value of the railroad's property within the state and allocated the proper percentage thereof to the counties through which the line operated, one of which was Carroll County. It was stipulated that property generally in Carroll County was assessed at fifty per cent of its fair cash value, whereas other counties assessed property generally at an average of thirty-five per cent of its fair cash value. Taxes were extended against the railroad property in Carroll County, based on an assessed valuation of fifty per cent of the full value, and, as heretofore noted, the court held that

such taxes in excess of those based upon a thirty-five per cent assessed valuation, were excessive and illegal.

In *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association, First Federal Savings & Loan Association, West Virginia Building and Loan Association and Empire Savings & Loan Association,* 126 W. Va. 506, 30 S. E. 2d 513, this Court had before it for review a judgment of the Circuit Court of Kanawha County fixing the assessments of the properties of the taxpayers for the imposition of ad valorem taxes in which it became necessary to construe the provisions of Code, 11-3-14-a, as amended, relating to the manner in which the value for assessment purposes of properties of building and loan associations should be ascertained. The Court said: "But we do not understand the appellants to contend that, admitting the power and efficacy of the legislative enactment of 1939, the same cannot be administered as directed, where to do so would discriminate against owners of other property of the same class in the same taxing district. This in reality is the paramount question presented on this appeal." There follows this statement that must be given the gravest consideration in considering the issue before this Court in the instant proceeding: "Appellants have produced testimony tending to show that other classes of property, such as real estate, oil and gas properties, automobiles and household goods are assessed at less than their true and actual value in Kanawha County. We think this testimony must be disregarded. The 'equal and uniform' provision of our Constitution 'means merely that as to classes of property, business or income there shall be uniformity of taxation.' *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813, 816. See also *Charleston & Southside Bridge Co.* v. *County Court, supra;* in re *Hancock County Federal Savings & Loan Association,* 125 W. Va. 426, 25 S. E. 2d. 543. * * *'" Thereafter there is quoted in the opinion several questions and answers directed to and made by the Chief Deputy Assessor of Kanawha County as to "the methods of assessment" of certain other types of Class

property. It shows that: Money is valued at one hundred per cent; accounts receivable at about seventy per cent, unless installment accounts, and then at approximately sixty-five per cent; livestock at approximately fifty per cent of the purchase value; notes at approximately seventy per cent of the face value; and the assets of small loan companies from eighty-five to eighty-eight per cent of their face value. As to the contention by the taxpayers that this evidence showed discrimination in assessment, this Court said, in referring to their assets: "* * * Clearly, as relates to safety and security it is a different type of property from the ordinary note or account. Why, therefore, should we be asked to reduce an assessment below its true value, merely because as to other property, the value of which is uncertain, and by reason of its character cannot be accurately determined, assessing officers have, in good faith, adopted a plan for arriving at an estimated value?" This was later repeated in the opinion in other language: "* * * We do not have a case where the true and actual value was ascertained and a discount allowed from that value; but rather a case where the discount was allowed, particularly as to intangibles, in an effort to reach the true value. * * *" The Court then reverts to the legislative authority under the provisions of Section 1, Article X, of the Constitution, to provide "methods" of ascertaining the value of property, concludes that the Tax Limitation Amendment made no changes with reference thereto and cited again the *Southside Bridge Company* case as authority. As heretofore noted, it was there held that the: "* * * legislature prescribes the manner in which it shall be taxed, *which mode* of taxation shall be equal and uniform as to all classes of property." (Italics supplied.) The decision of this Court in the *West Penn Power Company* case, *supra,* was discussed in the light of the subsequent decision of the Supreme Court of the United States in *Nashville, Chattanooga & St. Louis Ry. Co.* v. *Browning,* 310 U. S. 362, 60 Sup. Ct. 968, 84 L. ed. 1254, and doubt was expressed that, in view of the latter decision, the *West Penn Power Company* case could "now

be sustained by sole reliance on the Fourteenth Amendment." Later, the Court said: "* * * It may be that the principles of that case are sound, and that under our Constitution, without reliance on the Fourteenth Amendment, we should adhere thereto. But where do they lead us? * * *" Although the pertinent provisions of Section 1, Article X, of our Constitution, are quoted in the opinion, there is no reference to, or discussion of, the provision that: "* * * No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value; * * *." The testimony "tending to show" that other classes of property "were assessed at less than the true and actual value in Kanawha County" is not related in the opinion. The 3rd Syllabus Point of the case reads: "To entitle a complaining taxpayer to relief under the 'equal and uniform' provision of Section 1, Article X of the Constitution of West Virginia, there must be a clear showing of discrimination against him in the assessment of the same type of property. Such discrimination is not established where the showing is only that other property of a different type is assessed at less than its apparent or face value, through a process of estimation, and in a good faith effort to arrive at the true and actual value thereof."

This Court had before it, in *Bankers Pocahontas Coal Company, et al.* v. *County Court of McDowell County,* 135 W. Va. 174, 62 S. E. 2d 801, the question of whether the lands of the taxpayers had been assessed for ad valorem taxation disproportionately "to the valuation of similar and adjacent lands." That was the only question before the Court, and it affirmed the judgment of the Circuit Court of McDowell County, which, in turn had affirmed the action of the County Court, and, in effect, the Assessor of McDowell County that taxpayers had suffered no discrimination. The 2d Syllabus Point confirmed what this Court has held from its beginning that: "Arbitrary or unjust action by an assessor in fixing the value of land must be shown by clear and cogent proof in order that the complaining taxpayer may be

given relief from an allegedly excessive valuation." The 3rd Syllabus Point is not entirely clear as to the question here being considered, but in the opinion some statements are made that go far beyond the narrow issue presented by the record, or, at least, as revealed by the statements of fact contained in the opinion. It becomes necessary, therefore, to quote at some length from that opinion.

"With certain exceptions the organic law of this state requires that 'taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law * * *.' Article X, Section 1, Constitution of West Virginia. Since the adoption of the classification amendment to the Constitution of this State on August 10, 1932, this Court has considered the question of uniform and equal taxation. In *Christopher* v. *James*, 122 W. Va. 665, 12 S. E. 2d 183, in which a deficiency assessment of State income tax was considered, the Court in relation to the constitutional requirement of equality and uniformity in taxation made the following pertinent statement: 'That provision means merely that as to classes of property, businesses or incomes there shall be uniformity of taxation.' The foregoing statement in the *Christopher* case was approved in *In Re: Loan Association*, 125 W. Va. 426, 434, 25 S. E. 2d 543. The same principle was likewise upheld in *In Re: Tax Assessments*, 126 W. Va. 506, 30 S. E. 2d 513. The judgment of this Court in *In Re: Tax Assessments, supra,* was affirmed by the Supreme Court of the United States. *Charleston Federal Sav. & Loan Ass'n.* v. *Alderson*, 65 S. Ct. 863, 324 U. S. 182, 89 L. ed. 857. It is well established law in this jurisdiction that the equality and uniformity of taxes are confined to a species of property rather than all taxable property in a taxing unit.

"* * *.

"When there is a showing, as in the case of

*Power Co.* v. *Board of Review,* 112 W. Va. 442, 164 S. E. 562, that property has been taxed on the basis of one hundred per cent of its true and actual value, and that all other property of the same species in the same taxing unit is assessed on a basis less than the true and actual value the assessment on the lands of a complaining taxpayer should be reduced. The opinion in *Power Co.* v. *Board of Review, supra,* may be of doubtful force and effect, in view of the comment made in this Court's opinion in *In Re: Tax Assessments, supra,* But, giving the opinion in the case of *Power Co.* v. *Board of Review, supra,* full force and weight, Bankers and Crozer have not brought their lands within the purview of the holding in that case. The evidence in this proceeding is not sufficient to show that there was a general plan relating to the valuation of lands similar to the lands here considered. Hence, no reduction of the valuation of Bankers' and Crozer's lands can be predicated upon the theory enunciated in *Power Co.* v. *Board of Review, supra.*"

Although further reference will be made to the decision of this case, it should be noted that, while the statement in *Bridge Company* v. *County Court, supra,* that a tax upon all *businesses* of the same class which is uniform as to that kind of business, is valid, was enlarged in *Christopher* v. *James, supra,* to read: "* * * that provision means merely that as to classes of *property, businesses* or *incomes* there shall be uniformity of taxation." (Italics supplied.), such statement was converted in this case to this language: "* * * It is well established law in this jurisdiction that the equality and uniformity of taxes are confined to a *species of property* rather than all taxable property in a taxing unit." (Italics supplied.)

As heretofore stated, this Court held in *In Re: Tax Assessments Against The National Bank of West Virginia At Wheeling and The Morris Plan Savings and Loan Company, supra,* that under the provisions of Code, 11-3-14, providing for the manner in which the true and

actual value of the capital stock of banking institutions shall be determined for tax assessment purposes, is not complied with by adopting and enforcing the "book value" method alone. In the opinion, the Court said: "A number of errors were assigned. We believe, however, that a determination of the following propositions will afford answers to all material questions: * * * (5) whether either of the taxpayers involved has been denied due process of law." The 7th Syllabus Point relates to the XIV Amendment to the Federal Constitution. There is no syllabus point relating to Section 1, Article X, of the Constitution of this State. However, the first part of that Section is quoted, wherein it is directed that the value of property is to be ascertained as directed by law, which was the only part of that Section that had any application to the decision of this Court in that case, but, nevertheless, on Page 680 of the opinion appears this paragraph: "Moreover, the uniformity required relates to property of a particular class. It is not required that property, businesses or income of different classes be taxed equally and uniformly. *Bankers Pocahontas Coal Co.* v. *County Court,* 135 W. Va. 174, 62 S. E. 2d 801; *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association, et al.,* 126 W. Va. 506, 30 S. E. 2d 513; affirmed 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857; *Arslain* v. *Alderson,* 126 W. Va. 880, 30 S. E. 2d 533; *In Re: Tax Assessments Against Hancock County Federal Savings and Loan Association,* 125 W. Va. 426, 25 S. E. 2d 543; *Bridge Co.* v. *County Court,* 41 W. Va. 658, 24 S. E. 1002."

In the recent case of *In Re: Tax Assessments Against The Southern Land Company, Charles C. Dickinson, et al.,* 143 W. Va. 152, 100 S. E. 2d 555, the taxpayers assigned the following errors: "(1) Valuations on taxpayers' properties are in excess of their true and actual values; (2) taxpayers are discriminated against by lower valuations of like adjacent property; (3) taxpayers are discriminated against by assessment of Class III property in Boone County at 61.75% of its value and Class II property and Class IV property at 28.45% and 25.85%,

respectively; (4) taxpayers are discriminated against because Class III property in Boone County is assessed at a greater percentage of its true and actual value than Class III property in other counties; and (5) taxpayers are discriminated against because their property in Boone County is taxed higher than other species of property in West Virginia of equal value." It is clear from the opinion in this case that the decision turned upon the evidence, and it was held that the taxpayers had not proved that they had been discriminated against unlawfully in any regard as alleged in the assignments of error. It is stated in the opinion that: The Assessor, his deputy and a competent mining engineer "viewed all the properties which they were able 'to get to' in Boone County before making the valuations complained of."; the two witnesses of the taxpayers, in contradiction by way of opinion evidence of the Assessor and his witnesses, created a mere conflict; and under the decisions of this Court, the assessments would not be disturbed. It is true, however, that the pertinent provisions of Section 1, Article X, were quoted, and following is this statement: "* * * This requirement of equality and uniformity of taxation, as set forth in Article X, Section 1 of the West Virginia Constitution, means that as to all classes of property, business or incomes there shall be uniformity of taxation. * * *", citing the *West Penn Power Company* v. *Board of Review; Christopher* v. *James;* and *Charleston & Southside Bridge Company* v. *Kanawha County Court* cases; to which reference has heretofore been made.

It is interesting to note that in not one of these cases, and in no other pertinent decision of this Court, has the "no one species" provision of Section 1, Article X, of the Constitution, been discussed, or even mentioned. In a few cases, as heretofore noted, it was quoted along with the other provisions of the Section, but that was all. If, as contended by appellees, Section 1, Article X, of the Constitution, has been construed, and the provisions thereof that "all property, both real and personal, shall be taxed in proportion to its value", and "no one species

of property from which a tax may be collected shall be taxed higher than any other species of equal value" have been determined to have no meaning beyond the "equal and uniform" provision of that Section, no case is cited, and we find none in which that construction is found. If this Court had undertaken to construe this Section, it would have found authority in other jurisdictions wherein identical or similar constitutional provisions were considered.

The pertinent provisions of Section 28, Article II, of the Constitution of Tennessee, 1870, were construed in *Taylor* v. *Louisville & N. Ry. Co.*, 88 F. 350, and the opinion therein was written by William Howard Taft, then Circuit Judge, who, of course, later became Chief Justice of the United States Supreme Court. Such provisions of the Constitution of Tennessee read: "All property—real, personal and mixed—shall be taxed, * * *. All property shall be taxed according to its value, that value to be ascertained in such manner as the Legislature shall direct, so that taxes shall be equal and uniform throughout the State. *No one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value.*" (Italics Supplied.) Judge Taft, in his opinion, said: "The sole and manifest purpose of the constitution was to secure uniformity and equality of burden upon all the property in the state. As a means of doing so (conceding that defendant's construction is the correct one), it provided that the assessment should be according to its true value. *It emphasized the object of the section by expressly providing that no species of property should be taxed higher than any other species.* We have before us a case in which the complaining taxpayer, and other taxpayers owning the same species of property, are taxed at a higher rate than the owners of *other* species of property. This does not come about by legislative discrimination, but by the intentional and systematic disregard of the law by those charged with the duty of assessing all other species of property than that owned by complainant and its fellows of the same class. This is a flagrant violation

of the clause of the constitution forbidding discrimination in taxation between *different species* of property. That clause is self-executing. * * *" (Italics supplied.)

The Supreme Court of Arkansas, in *White River Lumber Company* v. *State,* 175 Ark. 956, 2 S. W. 2d 25, citing *Taylor* v. *Louisville & N. Ry. Co., supra,* held that it was a violation of the pertinent provisions of the Constitution of that state to tax the taxpayer's property at fifty per cent of its market value, whereas other "property in the county mentioned had been assessed at only thirty per cent of its value." It was therein held that the taxpayer's assessment should be reduced to thirty per cent of its value in conformity with the assessment on other properties. This is the provision of the Arkansas Constitution in effect at that time: "All property subject to taxation shall be taxed according to its value, * * * that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State * * *. *No one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value. * * *"* (Italics supplied.)

In *Greene* v. *Louisville & Interurban R. Co.,* (Ky.), 244 U. S. 499, 61 L. ed. 1280, 35 Sup. Ct. 673, this provision of the Kentucky Constitution was construed: "All property, whether owned by natural persons or corporations, shall be taxed in proportion to its value, * * *." Although the Constitution of that state has no "no one species" clause, it was held that the constitutional provision was violated by assessing the property of the taxpayer at seventy-five per cent of its actual value while taxable property in general was assessed systematically and intentionally at not more than fifty-two per cent of actual value.

In the Texas case of *Porter* v. *Langley,* 155 S. W. 1042, bank shares were assessed at one hundred per cent of true and actual value while real property of the value of $90.00 to $125.00 an acre was assessed at only forty per cent of actual value an acre. The collection of the

excessive tax on the bank shares was enjoined as being in violation of the provisions of the Texas Constitution that: "* * * property shall be taxed in proportion to its value.", although the Constitution of that state has no "no one species" provision.

Section 1 of Article IX of the Constitution of Illinois provided that the legislative body of that state should provide revenue "by levying a tax, by valuation, so that every person and corporation shall pay tax in proportion to the value of his, her or its property * * *." In *First National Bank of Urbana* v. *Holmes*, 246 Ill. 362, 92 N. E. 893, bank stock and other personal property were assessed at seventy-five per cent of their actual value while real property was assessed at forty-three per cent of its actual value, and the court held that such assessment was in violation of the Constitution of that state. In the opinion, it was said: "* * * It is not within the power of the Legislature to provide that different classes of property shall be valued differently, and, if moneys, mortgages, bonds, or securities are valued at a different proportion of their full value or on a different basis from other property, the Constitution and the law are both violated. * * *"

In *Cummings* v. *Merchants National Bank*, (Ohio), 101 U. S. 153, 25 L. ed 903, the Supreme Court of the United States, applying a provision of the Ohio Constitution, affirmed the judgment of the Circuit Court in enjoining excessive taxation attributable to the assessment of bank shares at one hundred per cent of their true value, whereas real property was assessed at about one-third of its actual value; ordinary personal property at about the same amount; and moneyed capital at six-tenths of its true and actual value. The Constitution of Ohio merely provided that: "* * * Laws shall be passed taxing by a uniform rule all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise; and also all the real or personal property, according to its true value in money. * * *"

Although there may be found decisions from other

jurisdictions contrary to the cases last cited in which the Constitutions contained no "no one species" provisions, we are cited no case in briefs of counsel, nor have we found any, permitting such discriminatory assessment of property for ad valorem tax purposes as is shown by this record under a constitutional provision which contained a "no one species" clause.

If this Court had at any time undertaken to construe the provisions of Section 1, Article X, of our Constitution, and read out of it the "no one species" and "in proportion to value" provisions, such a construction would certainly have led to a consideration of its origin in the Constitutional Convention of 1861-1863, in which it was adopted, and the legislative debate which led to the adoption of the resolution providing for the submission to the voters of this State the Amendment to Section 1, Article X, which was adopted in 1932, and, as heretofore stated, is often referred to as the Tax Limitation Amendment. Fortunately, the debates and proceedings of the First Constitutional Convention of this State were reported, preserved and have been printed at the direction of this Court in three volumes, containing more than twenty-five hundred pages of written material. It should be observed that insofar as the pertinent provisions of that Section are concerned, they remain as they were when adopted by that Convention, and approved by the voters of this State prior to June 20, 1863. There follows some quotations from the debate of the delegates to the Convention prior to its adoption. In commenting upon Section 1, in general, and the "no one species" provision in particular, the following delegates made the following observations: J. W. Paxton was the Chairman of the Committee on Taxation and Finance, and, in submitting the Section on taxation, including what became Section 1, Article X, said:

"* * * It is of this, sir, that the people of West Virginia have ever complained; and whilst the ordinance of secession may have been the occasion of this new State movement on the part of our people, I apprehend there can be little

doubt in the mind of any one that the fundamental cause for this division and desire for a new state may be found in the injustice and oppression which our people have suffered from unequal taxation, from oppressive taxation and unequal representation.

"It appears to me, sir, in framing a new constitution now for the people of West Virginia we should be particularly careful to guard against the liability in future of the perpetration of any such injustice on any portion of our own people."

Delegate Van Winkle: "* * * Now, sir, in reference to the taxation clause, here comes the rule; it is defining the principle and giving the legislature and all other persons to understand precisely what is meant here, and there can be no escape from it. The language of the whole section is concise, and it appears to me there is no unnecessary repetition. Some that may not be very palateable, but nevertheless necessary. It says in so many words, that no one species of property from which a tax may be collected shall be taxed less than any other species of equal value. I trust the Convention will retain this clause precisely as it stands. * * *. I think this is the turning point, the test question of all this matter, and it is now on this question proposed for this Convention to decide whether they do want taxes that are really alike or leave the whole matter at sea again and be treated as we have been under the present Constitution, by which an unjust proportion of taxes, as everybody knows, has been paid by this western section of the commonwealth— taxed, sir, to pay for slaves that are hung; taxed to pay rewards for runaway slaves; and then the slaves themselves not taxed in proportion to their value. * * *

"* * * I cannot imagine that any other system can be called 'equal and uniform', and the Convention may depend that it is not a question of language here—not because these words may be simply superflous—that they want them

stricken out. *It is because they want to get rid of the principle.* And if it is a mere question of words, then I beg the Convention to let the words stand, and we shall know precisely what this section means. There can be no mistake about it if these words· are left in." (Italics supplied.)

Delegate Lamb: "* * * The words here are so clear, so precise· that there is no misunderstanding the meaning,··and a common man as well as a lawyer can say exactly·what is their effect. * * *"

Delegate Dille: "* * * Then the second sentence goes a·little further, and I think it is proper, especially as we have so long contended for that principle—not contended for it in one view of it but in every view—and that more clearly expresses our sentiments. Having for the first time in the history of our portion of the state had an opportunity to do so, we clearly fix upon the legislature a prohibition that they shall not in the exercise of any discretion or any power that they may conceive that they may possess, upon any species of property, in any way, violate this fundamental princi*pal.* It seems to me we ought to have that provision, and we ought to so impress it, not only upon our people but upon our legislature that they may not under any circumstances, *in reference to any species of property, violate that fundamental principle; * * *.*

"Hence, I am in favor of the section as it stands; and I think it is really a provision that we ought to have and that we ought to abide by in detail for fear that the legislature might at some future period in its history feel disposed to violate in reference to some species of property this grand and fundamental principle that taxation shall be uniform throughout the entire State on every kind of property according to its value." (Italics supplied.)

Chairman Paxton: "* * * In regard to this second clause, 'no one species of property from which a tax may be collected shall be taxed higher' than another, I can assure gentlemen

that so far as I am concerned and the committee is concerned, there is no cat in the meal bag about it. It was simply intended to make just that much more specific, as I think it is, the first declaration that all property shall be taxed alike according to value. There cannot possibly be any misapprehension about that, it is so plain. * * *

"* * *.

"A single remark I forgot is simply this; that this section does not in any manner restrict the legislature in the imposition of *taxes on privileges or anything else that is not property*. The legislature is at perfect liberty to tax in any manner, shape or form, or by any name it pleases, what they please, provided they do it in conformity to this principle; to which I think no exception can be taken." (Italics supplied.)

Delegate Sinsel: "* * * In the second place, I understand all property shall be taxed in proportion to its value. That is, if one horse is worth $5, tax it on $5, and if another is worth $125, tax it on $125. And so on *with every other species of property*. Well, the mode of ascertaining the valuation, as I understand the section, the legislature is to prescribe—how it shall be done and who shall do it and so on. Well, now sir, in the first part of the second sentence, 'no one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value.' I presume this clause never would have entered into this Constitution had it not been that there is a clause in the present Constitution of Virginia which was in direct opposition to this principle; and I suppose the committee wished to remove all doubt from the mind of the most common reader that their property should be taxed in proportion to its value, no matter whether it was a horse, cow, sheep, hog, slave or whatever it might be. * * *" (Italics supplied.)

Delegate Van Winkle: "* * * If you want to make a constitution that is to confer the bene-

fits we hope to derive from it, then make it equal in its privileges and purview and don't give to one what you deny to another; don't impose a burden on one that you don't impose on another in proportion. That is the only fair and just rule; and if there is any cat in the meal, I should like to know where it lies. The cat must be in trying to make one pay more than his fair proportion if it lies anywhere."

Delegate Brown of Kanawha County, soon to become a Judge of this Court, offered an Amendment as a substitute for Section 1, which, if adopted, would have read:

"Taxation shall be equal and uniform throughout the State on all property both real and personal according to its value; but property used for educational, literary, scientific, religious and charitable purposes may by law be exempted from taxation."

Delegate Brown's Amendment was defeated by vote of thirty to seventeen. It is interesting and enlightening to compare Delegate Brown's Amendment to the pertinent provisions of the Constitution of Virginia of 1851, which was in effect in that state, and in what is now the State of West Virginia, until after the beginning of the War Between The States. Section 22, Article IV, of the Virginia Constitution provided that: "Taxation shall be equal and uniform throughout the commonwealth, and all property other than slaves shall be taxed in proportion to its value, which shall be ascertained in such manner as may be prescribed by law." Section 23, Article IV, provided: "Every slave who has attained the age of twelve years shall be assessed with a tax equal to and not exceeding that assessed on land of the value of three hundred dollars. Slaves under that age shall not be subject to taxation; and other taxable property may be exempted from taxation by the vote of a majority of the whole number of members elected to each house of the general assembly."

If this Court had found ambiguity in Section 1, Article

X, and undertaken to construe its language, as is contended by appellees that it has done, surely there would have been some reference to the Journal of the House of Delegates, West Virginia Legislature, Extraordinary Session, 1932, in which is recorded the action of that body that led to the amendment of Section 1, Article X, the Tax Limitation Amendment. By House Joint Resolution Number 3, there would have been submitted to the voters of this State an Amendment to that Section, in the following language: "The power of taxation shall never be surrendered, suspended or contracted away. Taxation shall be just and equitable. The Legislature shall have authority to classify property for taxation, but the rate shall be uniform upon all property of the same class." The Legislature refused to adopt this proposal, and instead a substitute for House Joint Resolution Number 3 was offered, passed by the Legislature and in the following November approved by the voters of this State. It is in the language heretofore quoted, and the provision that all "property shall be taxed in proportion to its value" and the "no one species" provision were retained.

Before evaluating the decisions of this Court that have heretofore been discussed, in the light of the principle of stare decisis, attention should be called to the decision of this Court in *Chesapeake & Ohio R. Co.* v. *Miller,* 19 W. Va. 408, decided on April 22, 1882. Although no question of the assessment of property for the levying of taxes was involved, this Court in that case did construe the provisions of Section 1, Article X, in finding that an Act of the Legislature was void as being in violation of the Section wherein it was attempted to exempt the Chesapeake & Ohio Railway Company from taxation "until the profits of said company shall amount to ten per cent on the capital of said company." With reference to that portion of the Section which is here pertinent, the Court said: "* * * The section of the Constitution we have been considering declares, first, that 'taxation shall be equal and uniform throughout the state.'

\* \* \*. But the *second* clause, 'and all property both real and personal shall be taxed,' certainly shows, that it was the intent of the framers of the Constitution to declare in most explicit terms, that *all* property in the state should bear its equal share of the burdens of the Government, and that there should be no property exempted from taxation, unless it was specifically excepted in the Constitution itself. \* \* \*. The *third* clause declares, that taxation shall be on the *ad valorem* principle. 'All property *real and personal* shall be taxed.' Upon what principle? Shall be taxed 'in proportion to its value.' How shall this value be ascertained? The *fourth* clause gives the answer in clear language, 'to be ascertained as directed by law.' The *fifth* clause prevents any discrimination in taxing different species of property and makes it more clear, that taxation should be uniform and on the *ad valorem* principle by declaring, that 'no one species of property, from which a tax may be collected, shall be taxed higher than any other species of property of equal value.' \* \* \*." See also *Franklin Ins. Co.* v. *The State, supra.*

In view of the questions raised in *In Re: Hancock County Federal Savings and Loan Association, supra,* and *Bankers Pocahontas Coal Company* v. *County Court, supra,* as to the correctness of the holding in the *West Penn Power Company* case, because of the decision of the Supreme Court of the United States in *Nashville, C. & St. L. Ry.* v. *Browning, et al.,* 310 U. S. 362, the decision in the *Browning* case should be carefully scrutinized. One of the complaints of the taxpayer in that case, and the only one here pertinent, was that it and all other railroads and public utility companies had been discriminated against by the taxing authorities of Tennessee in that such properties were assessed for ad valorem taxation purposes at actual value "while the property of all other taxpayers was assessed at two-thirds of its actual value." In support of that contention, the taxpayer had submitted affidavits of assessors and members of county boards of equalizers to the effect that "affiants intention-

ally and systematically assessed other property for taxation at an amount not exceeding 75% of its value. * * *" The petition of the taxpayer was dismissed in the Circuit Court, and the Supreme Court of Tennessee affirmed that action in *Nashville, C. & St. L.* v. *Browning, et al.*, 140 S. W. 781 (1940). In the opinion, the court gave these reasons for its action: Under the statutes of that state, the Railroad and Public Utilities Commission is empowered to assess for taxation purposes within that state railroad companies and other named public utilities. All such assessments may be reviewed on appeal by the State Board of Equalization, which was done in this case, and the Commission's assessment confirmed. All other property in Tennessee is assessed for taxation purposes by local assessors, which assessments are not final, but must be delivered to county boards of equalizers, all such officials being under oath to assess such property at its true and actual value. The assessment lists are then transmitted to the State Board of Equalization, which is required by law to meet at places throughout the state and "to equalize during its session the assessments of all properties in the state.", and its action "shall be final and conclusive as to all matters passed upon * * * subject to judicial review." By this procedure, it may be observed that the State Board of Equalization is the body and the only one which has the final authority of approving assessments of all property in Tennessee, including railroad companies and certain public utilities. In the opinion, the court said: "If the county assessors and the few members of county boards of equalizers making affidavits on the hearing before the Commission assessed property at less than actual value, and did so intentionally and systematically, there is no showing whatever that the members of the State Board of Equalization violated their oath of office by under-assessing property. In the absence of a contrary showing, it must be assumed that the State Board did their duty. There is neither allegation nor proof that the State Board intentionally and systematically refused to equalize assessments at actual

value. The good faith of such officers and the validity of their actions are presumed. * * *" In contrast to the applicable statutes in effect in this State, it is provided by law in Tennessee that the action of the State Board of Equalization, in making final assessments of the value of the property of railroad companies and certain public utilities for taxation purposes, "is made final and conclusive by statute and is not open to review by the courts on certiorari, where the Board has not, with reference to the assessment, exceeded its jurisdiction or acted illegally or fraudulently. * * *" In affirming upon certiorari the Supreme Court of Appeals of Tennessee, the Supreme Court of the United States rejected the taxpayer's claim that the assessment against it "violates the Fourteenth Amendment in its guarantees of due process and the equal protection of the laws, and is offensive to the Commerce Clause." In the opinion, Justice Frankfurter said: "* * * But the Tennessee Supreme Court did not deem petitioner's evidence sufficient to overcome the presumption that in the exercise of its reviewing function, the Board had equalized assessments in accordance with the command of state law. We should be reluctant on such a question to reject the state court's determination as without foundation, and there is not enough in the record to warrant its repudiation. * * *" This further pertinent observation is made in the opinion: "* * * It must be emphasized that the Company makes no claim that its property is singled out from among other public service corporations for discrimination. Its asserted grievance is common to the whole class. We must put to one side therefore all those cases relied on by the petitioner which invoked the Fourteenth Amendment against discriminations invidious to a particular taxpayer. * * *" It should be noted that in neither the opinion by the Supreme Court of Tennessee nor the opinion of Justice Frankfurter is there any reference to the "no one species" provision of the Tennessee Constitution, nor is there any mention of *Taylor* v. *Louisville & N. R. Co., supra,* decided in 1898.

The complaint of the taxpayer in the *West Penn Power Company* case was that it had been discriminated against individually, in that its real property had been assessed for taxation purposes at one hundred per cent of its value, whereas other owners of such property in Brooke County had been assessed at only eighty per cent of the value of such property, and the Assessor of that County flatly so testified. It seems apparent that the decision in the *Browning* case by the Supreme Court of the United States in no way affected the decision of this Court in the *West Penn Power Company* case, applying, as this Court did, only the XIV Amendment to the decision. Perhaps the language used in the two decisions of this Court, heretofore mentioned, casting doubt upon the validity of the holding in the *West Penn Power Company* case, in view of the Supreme Court's decision in the *Browning* case, is indicative of the supersensitive reaction of this Court in some cases involving questions of taxation under the XIV Amendment to the Federal Constitution, to the decisions of the Supreme Court of the United States in interpreting it. It would seem that such was a major contributing factor to the dicta, and, perhaps, decision in some cases, while the provisions of Section 1, Article X, of our Constitution were all but ignored. Even a gentle breeze, if it blew from the Potomac, was treated as if it had hurricane force. If there could be any doubt that an individual taxpayer was without recourse, where it was clearly shown that his property had been assessed for ad valorem taxation at one hundred per cent of its actual value, and his neighbor's property *of like kind* had been assessed for such purpose at eighty per cent of its value, or fifty per cent, or some lesser percentage, under the provisions of Section 1, Article X, of our Constitution, or of the XIV Amendment to the Constitution of the United States, that would be alarming indeed. If that were true, and, if under Section 1, Article X, of our Constitution, such a taxpayer could obtain no relief so long as property of the same class, or type, or species, was assessed at one hundred per cent of its actual value, while property of

other types, or classes, or species, were assessed at one-half of its value, then Section 1, Article X, would be completely emasculated.

In 17 M. J., Stare Decisis, Pages 185 to 197, the applicable West Virginia and Virginia cases are collected and commented upon. Reference is made to all of the cases there cited, but specific attention will be directed to only a few. The rule of stare decisis does not apply where the former decisions have misunderstood or misapplied the law or are contrary to reason. *Simpkins* v. *White,* 43 W. Va. 125, 27 S. E. 361. "* * * no legal principle is ever settled until it is settled right." *Weston* v. *Ralston,* 48 W. Va. 170, 36 S. E. 446. "* * * it is better to be right, than to be consistent with the errors of a hundred years." *Lovings* v. *Norfolk & W. R. Co.,* 47 W. Va. 582, 35 S. E. 962. "Whenever a decision of this Court is found, on careful consideration, to be illogical, opposed to public policy, and subversive of the supreme law of the land, the public welfare, and the sovereignty of the people, * * * it is the solemn duty of this Court to disapprove it and end its evil influences." *Ralston* v. *Weston,* 46 W. Va. 544, 33 S. E. 326. The 5th Syllabus Point of *Burks* v. *Hinton,* 77 Va. 1, follows: "The doctrine of *stare decisis* grows out of the necessity for a uniform and settled rule of property and definite basis for contracts and business transactions. If a decision is wrong, it is only when it has been so long the rule of action, that time and its continued application as the rule of right between parties, demand the sanction of its error, that this doctrine applies. It does not apply to questions of the construction of organic law." This Court does not, by quoting the syllabus point of this case, necessarily adopt that extreme view as its own. A question of law not brought to the attention of the Court, nor passed upon by it, cannot be considered as involving the same question. *Southern Ry. Co.* v. *Childrey,* 113 Va. 376, 74 S. E. 221. Obiter dicta or strong expressions in an opinion, where such language was not necessary to a decision of the case, will not establish a

precedent. *Chesapeake & O. R. Co.* v. *Martin,* 154 Va. 1, 143 S. E. 629. Many of the decisions of this Court and of the Supreme Court of Appeals of Virginia are cited in Footnote 15, Page 190, in support of this statement: "* * * General expressions, in every opinion, are to be read and considered in connection with the case in which these expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in the subsequent suit when the very point is involved for decision. * * *" See also Words and Phrases, Vol. 39A, Stare Decisis. Stare decisis and retrospective omniscient infallibility are not synonymous terms.

It is the judgment of this Court that the final judgment of the Circuit Court of Kanawha County must be reversed for the reason that it imposes a discriminate burden of taxation upon the taxpayer that is forbidden by Section 1, Article X, of the Constitution of this State. This Court does not have the authority to fix the assessment of its property so that it may be relieved of that discrimination, but such is by statute invested in the trial court and the case will be remanded for that purpose. The provisions of Section 1, Article X, of the Constitution, are clear and unambiguous. Particularly is that true as to the provisions relating to the taxing of property, real and personal, which are pertinent to the issue before this Court in this case. In plain, simple language it provides that all property not exempt from taxation "shall be taxed in proportion to its value. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value." The word "species" is defined in Webster's New International Dictionary as: "A sight, outward appearance, shape, form, a particular sort, kind, or quality, * * *." The word "class" is there defined as: "A group of persons, things, qualities, or activities, having common characteristics or attributes; a set; a kind, description, species, or variety." Section 1 is composed of simple words that were in general usage a hundred years ago as well as the present time. Their meaning

was the same as it is now. If it should be determined that the provisions of this Section of the Constitution were ambiguous, or that its language was unclear, and resort should be had to the rules of construction or interpretation, this Court would be compelled to reach the same conclusion as to its meaning. The constitutional and legislative history of the Section, the decisions of courts of other jurisdictions construing identical or similar constitutional provisions and the language used in this Section would inevitably demand the same determination. Judge Johnson construed the Section ably in 1882 in *Chesapeake & Ohio R. Co.* v. *Miller, supra,* as heretofore observed.

The only ambiguity that attaches to this Section arises from certain former decisions of this Court. All have been heretofore discussed and the opinion in each has been quoted herein to an extent that is not usually desirable. Clearly what was said in some of those cases that is in conflict with the decision of this Court in the instant case is pure obiter dictum. In others, if what was said that is inconsistent with what is here held may be recognized as rising to the dignity of becoming the law of the cases, the decisions were predicated upon dicta in former decisions and it was accepted as controlling without question. But whether decision or dicta, this Court is impelled to strike down whatever is contained in those former decisions of this Court that is in conflict with the decision in this case. Therefore, the following cases are disapproved insofar as, and only insofar as, they are in conflict with the decision of this Court in the instant case: *Charleston & S. Bridge Co.* v. *Kanawha County Court,* 41 W. Va. 658, 24 S. E. 1002; *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813; *In Re: Hancock County Federal Savings & Loan Association,* 125 W. Va. 426, 25 S. E. 2d 543; *In Re: Tax Assessments Against Charleston Federal Savings and Loan Association,* 126 W. Va. 506, 30 S. E. 2d 513, 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857; *Bankers Pocahontas Coal Co.* v. *County Court,* 135 W. Va. 174, 62 S. E. 2d

801; *In Re: Tax Assessments Against The National Bank of West Virginia at Wheeling and The Morris Plan Savings and Loan Company*, 137 W. Va. 673, 73 S. E. 2d 655; and *In Re: Tax Assessment Against The Southern Land Company, Charles C. Dickinson, et al.*, 143 W. Va. 152, 100 S. E. 2d 555.

In four of these cases either the principal or the sole issue before the Court was the validity of an Act of the Legislature directing the manner in which the value of a certain type or species of property should be ascertained for the laying of an ad valorem tax against it. These Acts were passed pursuant to the provision in Section 1, Article X, that property "shall be taxed in proportion to its value to be ascertained as directed by law." The action of the Court in finding the Act valid in each of those cases is approved. In two other cases, the trial court was affirmed in its decision that the taxpayer had failed to prove that his property had been assessed disproportionately to other property. Those decisions are likewise approved. The other case related to the construction and validity of the state income tax law then in effect, and did not involve the "property" provisions of Section 1, Article X, of the Constitution. It too is approved. We cannot accept the view that any of those cases would have been decided contrary to the principles herein enunciated if the evidence of discrimination between species of property had been as clear as it is in this case, and the taxpayer had relied solely upon the "property" provisions of Section 1, Article X, thus presenting to the Court the precise question that has been passed upon in this case. Our respect for the judgment and perspective of the Judges who participated in those decisions, and particularly of the Judges who wrote the opinions, is such that we must reject any suggestion to the contrary.

The XIV Amendement to the Constitution of the United States was adopted in 1868, five years after Section 1, Article X, of our Constitution. At that time many State Constitutions contained "equal and uniform" provisions

relating to taxation. Several, including ours, contained more specific and restrictive provisions relating to the taxing of "property". In construing the "due process" and "equal protection of the laws" provisions of the XIV Amendment, the Supreme Court has consistently held that a taxpayer has no valid complaint of discriminate property taxation under state law so long as he is treated as all others in his "class". It is only when the taxpayer is discriminated against within his own class that he may successfully invoke the protection of the XIV Amendment. The Supreme Court adopted the phrase "equal and uniform" to describe this conception of equality of taxation. The taxpayer in this case, for example, could expect no relief under the XIV Amendment in this Court, or in the Supreme Court of the United States. It and all others in its "class" are taxed alike, i.e., upon an assessment of their property at one hundred per cent of its actual value. In reference to taxation generally, Section 1, Article X, of the Constitution of this State, guarantees at least that much protection to the taxpayer. It provides that "taxation shall be equal and uniform." However, with regard to "all property, both real and personal", our Constitution gets more specific and restrictive. It provides that "all property" except that specifically exempted "shall be taxed in proportion to its value." Furthermore, so that there shall be no misunderstanding about it, there is the further provision that: "No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value." The only limitation which this Section places upon the Legislature in imposing any kind of taxes except *property* taxes is that such taxation shall be "equal and uniform." Thus, as to license taxes and taxes on privileges, franchises, incomes, et cetera, there may be, and is, classification and graduation of such taxes, sometimes in what some may consider extreme degrees. *Arslain, etc.* v. *Alderson,* 126 W. Va. 880, 30 S. E. 2d 533. The Business and Occupation Tax Code, 11-13, as amended, is an example. But property is a different matter altogether. The Legisla-

ture has the power and the duty to designate the manner in which the actual value of different kinds or "species" of property may be ascertained, but when such value has been ascertained, all species of property must be taxed equally in proportion to its value.

Four elements are necessary to the imposition of an ad valorem property tax: (1) A taxpayer; (2) taxable property; (3) an assessment of its value; and (4) a rate on the unit of valuation. In this State, the rate is based on each one hundred dollars of valuation. Under the provisions of Code, 11-8-5, as amended, property is divided into four classes, as heretofore noted, pursuant to the Tax Limitation Amendment of 1932. The constitutional amendment and the statute provide that the rate of taxation upon property of the different classes shall not exceed a designated sum of money upon each one hundred dollars of the assessed value of such property. The property of the appellant falls in Class I where the maximum rate is fifty cents on each hundred dollars of assessed valuation. It has no cause for complaint in that regard for the same rate was imposed upon all property of that class in Kanawha County for the year 1957. What this taxpayer complains of, and the evidence clearly shows that his complaint is valid, is that its property was taxed for that year upon an assessed value equal to the actual value of its property, whereas all other property except money was taxed upon an assessed value less than the actual value of such property. Neither the Tax Limitation Amendment, nor the enabling legislation enacted pursuant to it, purported to "classify" property by "species". There are several different species of property in Class I, and, of course, many other species of property in the other three classes. The Amendment of 1932 of Section 1, Article X, did not purport to change the Section except to prohibit the taxing of certain designated properties above fixed rates. It did not destroy the guarantee of property taxation proportionate to value, or the "no one species" provision. Nor did it empower any taxing official or the Legislature to do by indirection what it could not do directly. A horse used wholly for farm purposes and

a share of bank stock are both placed in Class I for rate purposes. If the actual value and the assessed value of each is four hundred dollars, no one would seriously contend that the farmer could be required to pay the maximum rate of fifty cents on his horse while the owner of the share of bank stock paid only twenty-five cents on his property. Nor could the same discrimination be practiced upon the farmer by assessing his horse at its actual value of four hundred dollars while the share of stock was assessed at two hundred dollars. But if both the horse and the share of stock were assessed at one-half of their actual value, and the maximum rate of fifty cents a hundred was placed on each, the amount of tax money derived would be exactly the same as if both were assessed at their actual value and a rate of twenty-five cents a hundred was imposed upon both. By following the latter procedure, the taxing authorities would be complying with mandatory constitutional and legislative law if that is of any importance. Whether one taxpayer is *taxed* twice as much as the other by virtue of the imposition of a *rate* twice as high as the other, or by an assessment twice as high as the other, it is forbidden by Section 1, Article X, of the Constitution. Furthermore, it is of no materiality whether the different species of property happens to fall in one or the other of the "classes" of Code, 11-8-5, as amended. If a taxing official, even without legislative sanction, can now *tax* the owner of one species of property twice as high as the owner of another species of property of equal value by fixing the assessed value of the property of the former at double the value of the property of the latter, when the actual value of both properties is identical, there is no reason why such an official could not have achieved the same evil result prior to the Amendment of 1932 by assessing the properties equally and then placing a *rate* on one twice as large as the other. The taxpayer in the instant case is being *taxed* higher, for the year 1957, than the owners of all other property in Kanawha County, excepting the owners of other bank stock and money, by an arbitrarily unequal *assessment* rather than by an unequal

or different *rate*. The Constitution forbids this kind of discrimination as between the owners of property of equal value whether the tax gatherer comes at the taxpayer through the front door or the back door. And it is forbidden whether the taxpayer owns much property or a small amount of property. And it matters not what kind or *species* of property he happens to own.

This Court does not have the power to amend, alter, or repeal any provision of the Constitution of this State. That is a prerogative that the people have reserved unto themselves alone. It is within our power though, and our paramount duty, to prevent others from amending or repealing any part of the organic law of this State except in the manner provided in the document itself. It may be the will of the people of this State, after ninety-six years, that the pertinent provisions of Section 1, Article X, should be changed or removed therefrom altogether. If so, the time is opportune. There was recently created, and is now functioning, a Commission on Constitutional Revision whose purpose is possible revision of the Constitution of 1872, and the subsequent Amendments thereto. It may be that Mr. Justice Frankfurter was expressing the sentiment of a majority of the people of this State in *Nashville, C. & St. L. Ry.* v. *Browning, et al., supra*, when he said: "This Court has previously had occasion to advert to the narrow and sometimes cramping provision of these state uniformity clauses, and has left no doubt that their inflexible restrictions upon the taxing powers of the state were not to be insinuated into that meritorious conception of equality which alone the Equal Protection Clause was designed to assure." Maybe so. Maybe not. The people of Virginia had some bitter experiences prior to the Revolutionary War with what King George III considered a "meritorious conception" of taxation. They found this system unpalatable in that it cast an unequal burden upon those least able to bear it. "Taxation without representation" was a principal cause of the King losing a very valuable part of his kingdom. The State of Virginia at first

abhorred, later endured, and finally embraced this principle. It seems that while the political power and most of the taxable property was concentrated in the eastern part of the state, it was the consensus of the inhabitants of the western counties that the tax gatherers were consecrated public officials only when performing their duties beyond the foothills. So it came to pass that in 1863 she lost her western counties, and one of the primary causes was the flexibility of the "equal and uniform" provision of the Constitution of that state. Under it, the wealthy property owners of the eastern part of the state did not pay taxes upon their property "in proportion to its value." The burden of ad valorem property taxation fell heaviest upon the small property owners, the farmers, the merchants and the householders of the western part of the state. The people of the new State of West Virginia, who had been very unhappy indeed with the "meritorious conception of equality" of the Virginia Constitution, demanded and got into their new Constitution some "narrow and sometimes cramping" provisions relating to property taxation, and to this day they have never been removed or changed. If the people of this State demand for themselves a little more "due process" and "equal protection of the laws", in regard to property taxation than is provided by the Constitution of the United States, that is a matter exclusively within their power of determination. It is a matter that is of no concern of the Supreme Court of the United States, any Justice thereof, or any other person except a citizen of this State. It is evident that the people of this State are still wary of Levi the publican and all of his official successors even unto this day.

We are not influenced by the testimony of the Assessor, to the effect that, according to the Tax Commissioner's appraisal, isolated parcels of real property in Kanawha County may vary in assessment, as related to actual value, from nine per cent to one hundred thirty per cent. In a county of this size, or in any county, perfection is not expected of an assessor, or a county court, in performing his or its duties. We approve the views

expressed by this Court in *Bankers Pocahontas Coal Co., et al.* v. *County Court, supra,* in quoting from *City of Roanoke* v. *Gibson,* (Va.), 170 S. E. 723, that: "Sporadic deviations from an established rule in the case of other properties are not in themselves sufficient. A petitioner must show that the plan adopted generally was not applied to him. * * *", and: "Though we do not approve deviations from the constitutional standards of uniformity or equality, we think that even if there should be deviations in a few instances from the standard as to assessed valuations of similar lands, it would not be a sufficient premise on which to conclude that the valuations of Bankers' and Crozer's lands should be reduced." The rule must be applied conversely also. Upon that question, and also the great weight this Court gives to the testimony of taxing officials as to the correctness of their assessments, reference is also made to *In Re: Tax Assessments* v. *Southern Land Company,* 143 W. Va. 152, 100 S. E. 2d 555.

In accordance with the foregoing, the judgment of the Circuit Court of Kanawha County is reversed and this case is remanded to that court for further proceedings, not inconsistent with the principles herein enunciated.

*Reversed and*
*remanded with*
*directions.*

HAYMOND, JUDGE, dissenting:

Believing as I do that the decision of this Court reversing the judgment of the circuit court in this case is not supported by the evidence, is contrary to its prior decisions, is logically inconsistent and is legally unsound, I respectfully but emphatically express my dissent.

The evidence shows beyond question that there is no general assessment of property in Kanawha County for 1957 at forty per cent of its true and actual value. On the contrary it clearly appears from the undisputed evidence that the assessor is merely engaged in an effort to

assess some properties at that percentage of their value in order to comply with the requirements of Chapter 1, Acts of the Legislature, First Extraordinary Session, 1955, to obtain state aid for schools, and that various types of property are assessed at widely different percentages of their true and actual value. For instance bank stock is uniformly assessed at one hundred per cent of its value; cash on hand and money in bank are assessed at the same percentage of their value; accounts receivable and notes receivable at sixty per cent of their value; inventories at fifty per cent of their value; and machinery and equipment at twenty per cent of their original cost. The assessment of real estate is not uniform or general and ranges from nine per cent to one hundred and thirty per cent of its true and actual value. That the evidence utterly fails to establish any general or systematic assessment of forty per cent of the true and actual value of property in Kanawha County for the year 1957 is conclusively shown by the uncontroverted testimony of John M. Slack, then the Assessor of Kanawha County, upon which the plaintiff, The Kanawha Valley Bank, bases its claim to a reduction of the value of its stock to forty per cent of its true and actual value on the ground that the assessment of the stock at one hundred per cent constitutes an unlawful discrimination to that extent against the plaintiff in violation of the provisions of Article X, Section 1, of the Constitution of this State that taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law, and that no one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value.

Called as a witness by the plaintiff the assessor was asked these questions and gave these answers: "Q. Having arrived at a value by the book value method, what percentage of that true and actual value have you assessed the stock? A. One hundred per cent. Q. What percentage of true and actual value have you assessed other property in Kanawha County for the year 1957? A. We

have *made an attempt to assess* it at 40 per cent, according to Senate Bill 3. Q. Have you made any effort to assess other property in Kanawha County at 100 per cent of its true and actual value? A. None other than Class I property, and that, of course, we inherited from procedure carried on in the past. Now I might say, if I may, that in my conversation with Mr. Brown on July 22 he stated that he was using book value throughout the entire State, with the exception, I think, of a bank in Logan County, and that he had not looked upon the factors such as we considered last year as being proper. Then of course, insofar as I know the other banks within our area, the capital stock is valued and assessed at book value, which is 100 per cent. * * *. Under the requirements of Senate Bill 3, *actually I am no longer an Assessor if I expect to obtain State aid for schools.* I have to follow the mandates and the findings of the evaluation arrived at by the office of the State Tax Commissioner. * * *. Cash on hand and money in the bank at 100 per cent, accounts receivable at 60 per cent, notes receivable at about 60 per cent, and the way you determine that is how they are supported, by deed of trust, security and so forth." Question by a County Commissioner: "Mr. Slack, are all banks in Kanawha County assessed according to this same rule you are using on The Kanawha Valley Bank? A. On book value? Q. Yes. A. So far as I know they are. I have Mr. Gaten's word that they have been. I have not looked at it myself personally but he advises me they are assessed at book value. Q. Do you know what percentage of true and actual value livestock is assessed at? A. Frankly, I don't. Q. Is it very low? A. It is very low. Q. Then as I understand, you have used less than 100 per cent of true and actual value in other classes of property. A. Yes, in the case of inventories we assess inventories at 50 per cent. We assess machinery and equipment at 20 per cent of the original cost. We find that by using this method we come up with nearer the same figure that the Tax Commissioner uses in arriving at *his values for State aid purposes.* Q. And real estate, what percentage of the true

and actual value? A. Of course, we have *a gross inequality there,* according to the State Tax Commissioner our real estate runs from something like 9 to 130 per cent. As far as I know we are placing all real estate on the books at not less than 40 per cent of the Tax Commissioner's appraisal, *in order to qualify for State aid.* Q. Would you consider that not less than 40 per cent of true and actual value? A. No. *it is 40 per cent of the State Tax Commissioner's appraisal, and he is basing his appraisal upon 1950 costs,* which he states is about 25 per cent less than costs would be on today's market. Q. Do you consider that you are assessing real estate on the average in Kanawha County at 100 per cent of true and actual value? A. I do not. Q. At about what percentage of true and actual value would you estimate you are assessing it? A. There again we go back to the survey of the State Tax Commissioner, and he claims it is about 35 per cent of his appraisal, which would be 25 per cent less than the value as of 1957. Senate Bill 3 refers to true and actual value. However, for purposes of this survey the Tax Commissioner's Property Evaluation Department is using replacement costs less depreciation, and they are based upon 1950 replacement costs, and according to them the replacement costs have increased from 1950 to 1957 by some 25 per cent. Q. Then would that mean that *if you were assessing at 40 per cent of the 1950 value that you would actually be assessing real estate at less than 40 per cent of the true and actual value today?* A. I would say it would, yes. * * *. Q. Mr. Slack, in arriving at the value of taxable property in Kanawha County *for purposes of determining percentage of assessed value for State aid to schools,* do you know how the Tax Commissioner arrived at the value of Kanawha County property? A. By replacement cost less depreciation. Q. I mean, did they examine certain properties or all properties in Kanawha County? A. They state that they have spot checked 2200 pieces of property. However, in the past thirty days I have probably talked to as many as fifty people who have never

seen an appraiser, on whose property it was reported they have spot checked." (Emphasis supplied).

On cross-examination the assessor was asked these questions, among others, and gave these answers: "Q. You have also been advised by the Tax Commissioner that a spot check was simply their method of obtaining information, and that you were not completely bound by it in your assessment? A. *Not bound by it except in my percentage for State aid purposes. * * *.* Q. Yes, but their spot checks and the figures they give you with reference to particular pieces of property is simply their opinion, based on information they had of the value from sources which we don't know, but which you are not completely bound by as to your assessment for tax purposes. Isn't that right? A. *I am only bound in order to qualify for State aid. * * *.*" (Emphasis supplied).

From the foregoing uncontroverted evidence it is obvious that there was no systematic or general assessment of property in Kanawha County in 1957 at forty per cent of its true and actual value but, on the contrary, the real estate assessments varied from "9 to 130 per cent" of such value; that the assessment of real estate "at not less than 40 per cent of the Tax Commissioner's appraisal" shows that such assessment at least in some instances was more, without indicating how much more in any specific case, than forty per cent of its true and actual value; that bank stock was uniformly assessed at one hundred per cent of its value; and that numerous other classes of property were assessed at different percentages of their value. Under the evidence there has been no discrimination against the plaintiff in favor of other holders of bank stock, all having been assesed at one hundred per cent of its value, and there is no justification for reducing the stock of the plaintiff from one hundred per cent of its value to a nonexistent general or systematic valuation of forty per cent. In the absence of any showing of a general or systematic assessment of property at forty per cent of its true and actual value, which the plaintiff was required but has failed to es-

tablish, there has been no prejudicial or unlawful discrimination against the plaintiff to the extent of the difference between one hundred per cent and forty per cent of the true and actual value of its stock.

The evidence merely shows "a systematic plan," to use the language of the majority, to assess property in Kanawha County at approximately forty per cent of its true and actual value. "A systematic plan" *to assess property* does not constitute a general or systematic *assessment of property* and furnishes no basis for the determination of discrimination against the plaintiff in the valuation and the assessment of its property. (Emphasis suplied). In the light of the undisputed evidence any general assessment of property in the county at forty per cent of its true and actual value, which results in any prejudicial discrimination against the plaintiff in the assessment of its stock at one hundred per cent of its true and actual value, is completely eliminated from this case. The evidence demonstrates an utter failure to establish any uniform standard of valuations of forty per cent with which to compare the valuation at which the stock of the plaintiff has been assessed and unless such standard is established there can be no unlawful discrimination against the plaintiff in the assessment of its stock at a higher valuation than that placed upon other property in the county. See *In Re: Tax Assessments Against Charleston Federal Savings and Loan Association,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed in *Charleston Federal Savings and Loan Association* v. *Alderson,* 324 U. S. 182, 65 S. Ct. 624, 89 L. Ed. 857. In that case, though the intangible property of the taxpayer, a Federal savings and loan association, was valued at approximately thirty per cent more than other property of the same class which was valued at approximately seventy per cent of its true and actual value, notes and accounts were valued at sixty five to seventy per cent and bonds at seventy per cent of their face value, livestock and agricultural products were valued at about fifty per cent of their purchase value, and accounts receivable and notes were valued at about

eighty five per cent of their face value, this Court found that these differences in valuations of various types of property did not constitute an unconstitutional discrimination to the prejudice of the complaining taxpayer. See also *In Re: Tax Assessments Against The Southern Land Company*, 143 W. Va. 152, 100 S. E. 2d 555. Having failed to establish any existing standard of a general or systematic assessment of property at forty per cent of its true and actual value by which to determine the degree or extent of any discrimination against the plaintiff in the assessment of its bank stock at one hundred per cent of its true and actual value, the plaintiff is not entitled to a reduction in the assessment of its stock from one hundred per cent, the percentage at which all other bank stock is admittedly assessed, to a mythical, fancied or imaginary standard of forty per cent of its true and actual value.

Inasmuch as all bank stock is assessed at one hundred per cent of its true and actual value and as its assessment at that percentage of its value is not discriminatory but equal and uniform among the members of that class of property owners, this Court should have adhered to and followed its former decisions and held valid the assessment as fixed by the circuit court on the basis of one hundred per cent of the true and actual value of the stock of $6,000,000.00.

In invalidating the assessment of the stock of the plaintiff for failure to conform to an imaginary standard of valuation of property at forty per cent of its value, this Court ignored and, I think erroneously, refused to follow its prior decisions which recognize the validity of assessments which are equal and uniform within the same type or class of property even though other and different types or classes of property are not taxed at the same valuation provided taxation within the particular class is equal and uniform. Until the decision in this case this Court, under Article X, Section 1, of the Constitution of this State, has upheld the validity of taxation of property in a particular class which is equal

and uniform within that class and has consistently held that a tax upon all business of the same class which is uniform as to that class is not unconstitutional.

That the present decision is in direct conflict with numerous prior decisions of this Court involving the validity of assessments of taxes based upon the value of the property against which the challenged tax was assessed and constitutes a surprising and, in my judgment, an entirely unwarranted disregard of the salutary principle of *stare decisis,* clearly appears from even a cursory examination of the cases in which those decisions were rendered.

In *Charleston and Southside Bridge Company* v. *Kanawha County Court,* 41 W. Va. 658, 24 S. E. 1002, error dismissed, 168 U. S. 704, 18 S. Ct. 941, 42 L. Ed. 1212, cited with approval in numerous later cases and never criticized or departed from until the present decision, the assessment of a toll bridge of the plaintiff in the manner required by a statute providing a particular method of assessing toll bridges and ferries was challenged as violative of the provisions of Article X, Section 1, of the Constitution. It was contended that the bridge should be assessed as other real estate and not as personal property. This Court rejected that contention and recognized the validity of the valuation of any class of property where the value of the same class of property is ascertained throughout the State in the same manner. Points, 2, 3 and 4 of the syllabus in that case are expressed in this language: "2. The legislature has power to prescribe the method by which the valuation of any class of property may be ascertained, and, where the value of the same class of property is ascertained throughout the state in the same manner, such valuation can not be regarded as unconstitutional for lack of uniformity or equality. 3. The Constitution prescribes what property is to be taxed, and the legislature prescribes the manner in which it shall be taxed, which mode of taxation shall be equal and uniform as to all classes of property. 4. A tax upon all business of the same class, which is uniform

as to that kind of business, is not unconstitutional." There could be no clearer indication that this Court recognized as valid and constitutional the division of property into different classes with different values among the classes if the valuation within the particular class is equal and uniform, under both the "equal and uniform" and the "no one species" provisions of Article X, Section 1, of the Constitution, not under one without regard to the other, than the statements in the syllabus in the *Charleston and Southside Bridge Company* case that "where the value of the same class of property is ascertained throughout the state in the same manner, such valuation can not be regarded as unconstitutional for lack of uniformity or equality," and that "A tax upon all business of the same class, which is uniform as to that kind of business, is not unconstitutional." The last quoted statement, if it has any meaning, means not unconstitutional under both the "equal and uniform" clause and the "no one species" clause of the Constitution.

In *Christopher* v. *James*, 122 W. Va. 665, 12 S. E. 2d 813, involving the question of the right of the taxpayer to deduct certain items of expenses of business from taxable income under a statute then in force but since repealed, this Court, discussing the meaning of the requirement of equal and uniform taxation under Article X, Section 1, of the Constitution said: "That provision means merely that as to classes of property, businesses or incomes there shall be uniformity of taxation. 'A tax upon all business of the same class, which is uniform as to that kind of business, is not unconstitutional.' *Charleston & S. Bridge Co.* v. *County Court*, 41 W. Va. 658, 24 S. E. 1002." That quotation again gives recognition to the validity of the asssessment of taxes upon property in different classes if the assessment is equal and uniform within the same class.

In the case of *In Re: Tax Assessments Against Hancock County Federal Savings and Loan Association*, 125 W. Va. 426, 25 S. E. 2d 543, involving the valuation of property of a Federal savings and loan association for

the assessment of ad valorem taxes and the question whether certain items were exempt from taxation, this Court, after incorporating in the majority opinion the identical provisions of Article VIII, Section 1, of the Constitution of 1863, and Article X, Section 1, of the present Constitution before it was amended in 1932, that "Taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property from which a tax may be collected, shall be taxed higher than any other species of property of equal value; * * *.", referring to *other classes of property* assessed at less than its true and actual value, used this language: "The contention that we should reduce the assessment of the association's property because, as contended, certain property of other classes, particularly real estate, is assessed at something less than its true and actual value is without merit. In *West Penn Power Co.* v. *Board of Review,* 112 W. Va. 442, 164 S. E. 862, it was held, in effect, that a taxpayer was entitled to have his property assessment reduced to the level at which *other property of the same class* was assessed in the same governmental unit. It will be noted that this decision applies to *property of the same class.* It does not appear that intangible property in Hancock County is assessed at less than its true and actual value. There is, therefore, no basis for the application of the rule laid down in the *West Penn* case. This question was raised in *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813, 816, and it was stated in the body of the opinion that the requirement of equal and uniform taxation set out in Article X, Section 1, of our Constitution 'means merely that as to classes of property, businesses or incomes there shall be uniformity of taxation.' See also, *Bistor* v. *McDonough,* 348 Ill. 624, 181 N. E. 417; *People* v. *Telephone Co.,* 277 Ill. 303, 36 N. E. 2d 362." (Emphasis supplied).

In the case of *In Re: Tax Assessments Against Charleston Federal Savings and Loan Association,* 126

W. Va. 506, 30 S. E. 2d 513, affirmed *Charleston Federal Savings and Loan Association* v. *Alderson,* 324 U. S. 182, 65 S. Ct. 624, 89 L. Ed. 857, involving an assessment of ad valorem taxes upon the property of certain savings and loan associations and building and loan associations, in which reductions of values fixed by the assessor were reversed by the board of review and equalization, and the values fixed by the assessor were restored by the circuit court and affirmed by this Court, the unanimous opinion, prepared by Judge Fox, contains several statements which are pertinent to, and, in my judgment, should control the decision in this case and require a conclusion contrary to that reached by the majority. Repeating its previously expressed view of the meaning of the "equal and uniform" provision of the Constitution this Court said: "The 'equal and uniform' provision of our Constitution 'means merely that as to classes of property, business or income there shall be uniformity of taxation.' *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813, 816. See also *Charleston & Southside Bridge Co.* v. *County Court,* supra; *in re Hancock County Federal Savings & Loan Association,* 125 W. Va. 426, 25 S. E. 2d 543." In that case the assessor had placed a higher valuation upon the property of the complaining taxpayers than the valuations placed upon other species of property just as in the case at bar the stock of the plaintiff was assessed uniformly with the stock of other banks at one hundred per cent of its true and actual value which was higher than the assessment of accounts receivable and notes receivable at sixty per cent, and inventories at fifty per cent, of their true and actual value, machinery and equipment at twenty per cent of their original cost, and real estate, as to which there was "gross inequality" at nine to one hundred and thirty per cent of its true and actual value. This Court unanimously rejected the contention of the taxpayers that the assessment of their property at the higher valuation was unconstitutional discrimination against them and held the assessment as made by the assessor to be valid and constitutional.

Concerning the question of discrimination this Court said: "On the record before us, we do not believe a clear case of discrimination has been shown. No one contends that the property of the appellants has been assessed in excess of its true and actual value." The plaintiff in the case at bar likewise does not seriously contend that the value fixed by the circuit court of $6,000,000.00 is in excess of the true and actual value of its stock. The opinion also contains these statements: "Appellants would not be permitted to do business if their respective assets were less in value than that reported to the assessor. State and Federal authorities would intervene, if such a situation existed. As has been stated above, the assets of each of the appellants were originally selected after the most rigid test as to its value, and care taken to guard against the fluctuation in values of properties securing such assets. Clearly, as relates to safety and security it is a different type of property from the ordinary note or account. Why, therefore, should we be asked to reduce an assessment below its true value, merely because as to other property, the value of which is uncertain, and by reason of its character cannot be accurately determined, assessing officers have, in good faith, adopted a plan for arriving at an estimated value?" And finally as to discrimination, the opinion states: "Our holding goes no further than this: What has been shown with reference to the assessment of intangible property in Kanawha County, of types other than that owned by the appellants, is insufficient to establish a case of discrimination, which would justify us in applying the principles announced in *West Penn Power Co.* v. *Board of Review and Equalization,* supra."

With respect to Article X, Section 1, of the Constitution, the opinion contains these statements: "Recent radical changes in our tax system, brought about by the adoption of the tax limitation amendment, Section 1 of Article X of our Constitution, where property is classified, gives rise to the suggestion that once property has been classified, there can be no further distinction as to property within a given classification. Whether there

can be such distinction is perhaps dependent on the character of the property involved. Each of the four classifications of property for tax purposes includes property of different types, for the ascertainment of the value of which different methods are employed. In the very nature of things this must be true. The Constitution plainly says that the value of all property for tax purposes shall be ascertained 'as directed by law'. Who gives the direction? Obviously, the sole law-making authority, the legislature. In respect to building and loan and federal savings and loan associations, as well as other types of property, the legislature has given specific direction, and as to other types of property the directions are more general. We do not doubt the inherent and constitutional power of the legislature to give these directions, so long as they are designed to provide a method in keeping with the aim to tax property equally and uniformly, as required by our Constitution. So far as concerns our State Constitution, we think the question is set at rest by the decision of this Court in *Charleston & Southside Bridge Co.* v. *Kanawha County Court,* supra. That case was decided in 1896, when there was no classification of property for tax purposes, and uniform tax rates, in each taxing district, applied to all property. However, Section 1 of Article X of the Constitution, as it then was, contained the same provisions with respect to equality and uniformity as those contained in the present Constitution. In that case the plaintiff was the owner of a toll bridge and the legislature had provided a particular method for the assessment of toll bridges and ferries." After quoting points 2, 3 and 4 of the syllabus in the *Bridge Company* case, the opinion continues: "We know of no subsequent case which in any way departs from that decision. It was cited with approval in *Christopher* v. *James,* supra. The later classification of property does not, in our opinion, call for any departure from the principles therein pronounced. *We think they are applicable to our present tax system."* (Emphasis supplied).

In *Bankers Pocahontas Coal Company* v. *County Court*

*of McDowell County,* 135 W. Va. 174, 62 S. E. 2d 801, this Court, in a unanimous decision, refused to disturb valuations fixed by the assessor which were affirmed by the county court and the circuit court and which the taxpayer challenged on the ground that such valuations on its three tracts of land were excessive and higher than those placed upon contiguous lands of other taxpayers. In the opinion this Court said: "With certain exceptions the organic law of this state requires that 'taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law * * *.' Article X, Section 1, Constitution of West Virginia. Since the adoption of the classification amendment to the Constitution of this State on August 10, 1932, this Court has considered the question of uniform and equal taxation. In *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813, in which a deficiency assessment of State income tax was considered, the Court in relation to the Constitutional requirement of equality and uniformity in taxation made the following pertinent statement: 'That provision means merely that as to classes of property, businesses or incomes there shall be uniformity of taxation.' The foregoing statement in the *Christopher* case was approved in *In Re: Loan Association,* 125 W. Va. 426, 434, 25 S. E. 2d 543. The same principle was likewise upheld in *In Re: Tax Assessments,* 126 W. Va. 506, 30 S. E. 2d 513. The judgment of this Court in *In Re: Tax Assessments,* supra, was affirmed by the Supreme Court of the United States. *Charleston Federal Sav. & Loan Ass'n.* v. *Alderson,* 65 S. Ct. 863, 324 U. S. 182, 89 L. ed. 857. *It is well established law in this jurisdiction that the equality and uniformity of taxes are confined to a species of property rather than all taxable property in a taxing unit.*" This statement shows clearly that despite the "no one species" clause of Section 1, this Court, in the cited cases, upheld the validity of uniformity of taxation within a particular class or species of property even though there should be a different value upon property within another or different class or species of property if the

taxation was uniform within the same class or species, which is in direct conflict with the holding of the majority in the instant case. (Emphasis supplied).

In *In Re: Tax Assessments Against The National Bank of West Virginia at Wheeling and The Morris Plan Savings and Loan Company*, 137 W. Va. 673, 73 S. E. 2d 655, the complaining taxpayers challenged the assessment of ad valorem taxes against the property of a national bank and an industrial loan company. The assessor made the original assessment on the basis of the book value of the shares of stock in each corporation. The county court upon review arrived at a different value by considering other relative methods and factors. The taxpayers contended that the valuation of the shares should be based on a sales price method. This Court reversed the assessment based on the book value method and in the opinion which was concurred in by two of the three judges who constitute the majority in the case at bar used this language: "Our State Constitution, Article X, Section 1, provides: 'Subject to the exceptions in this section contained, *taxes* shall be equal and uniform throughout the State, and all property, both real and personal shall be taxed in equal proportion to its value to be ascertained as directed by law * * *.' The exceptions made in the section have no application to the questions involved in the instant proceeding. Thus, the ultimate goal is 'equal and uniform taxation'.

"Moreover, the uniformity required relates to property of a particular class. It is not required that property, businesses or income of different classes be taxed equally and uniformly. *Bankers Pocahontas Coal Co.* v. *County Court,* 135 W. Va. 174, 62 S. E. 2d 801; *In Re: Tax Assessments Against Charleston Federal Savings & Loan Association, et al.,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed 324 U. S. 182, 65 S. Ct. 624, 89 L. ed. 857; *Arslain* v. *Alderson,* 126 W. Va. 880, 30 S. E. 2d 533; *In Re: Tax Assessments Against Hancock County Federal Savings and Loan Association,* 125 W. Va. 426, 25 S. E. 2d 543; *Bridge Co.* v. *County Court,* 41 W. Va. 658, 24 S. E. 1002."

In the recent case of *In Re: Tax Assessments Against The Southern Land Company*, decided in 1957, 143 W. Va. 152, 100 S. E. 2d 555, in which the taxpayers challenged assessments of ad valorem taxes on lands owned by them in Boone County based on true and actual valuations fixed by the assessor which, except as to four tracts, were affirmed by the county court and by the circuit court upon appeal. The grounds on which the taxpayers assailed as unconstitutional the valuations of their property, as determined by the assessor and the county court, were that the valuations were in excess of the true and actual value of their property; and that they were discriminatory because lower valuations were placed upon similar adjacent property, because Class III property was assessed at 61.75 per cent of its value, Class II property at 28.45 per cent of its value, and Class IV property at 25.85 per cent of its value in Boone County, because Class III property in that county was assessed at a greater percentage of its value than the same class of property in other counties, and because the property of the taxpayers in that county was taxed higher than other species of property in this State of equal value. In a unanimous decision concurred in by two of the judges who joined in the decision of the majority in the case at bar, this Court rejected the foregoing contentions of the taxpayers and affirmed the circuit court in upholding the validity of the challenged assessments. The opinion in that case contains these pertinent pronouncements concerning the meaning and effect of both the "equal and uniform" and the "no one species" provisions of Article X, Section 1, of the Constitution of this State:

"Subject to the limitations governing the jurisdiction of this Court, the question before us is raised by Article X, Section 1, of the West Virginia Constitution, which reads: 'Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as

directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value * * *.' This requirement of equality and uniformity of taxation, as set forth in Article X, Section 1 of the West Virginia Constitution, means *that as to all classes of property, business or incomes* there shall be uniformity of taxation. *West Penn Power Co.* v. *Board of Review and Equalization of Brooke County,* 112 W. Va. 442, 164 S. E. 862; *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813; *Charleston & Southside Bridge Co.* v. *Kanawha County Court,* supra." (Emphasis supplied).

The foregoing quotation "that as to all classes of property, business or incomes there shall be uniformity of taxation" shows conclusively that this Court, in considering both the "equal and uniform" provision and the "no one species" provision of Article X, Section 1, of the Constitution, which were quoted in the opinion in the *Southern Land Company* case and also in the opinion in the *Hancock County Federal Savings and Loan Association* case, recognized the validity, under both provisions, of classifications for the valuation of taxable property of different types or classes provided the valuation within each particular class was equal and uniform. If it did not do so it would not have expressly used the terms "all classes" which necessarily imply the existence of more than a single class or species of property the valuation of all of which must be the same to be equal and uniform. The application now made by the majority in the instant case of the "no one species" clause necessarily abolishes "all classes" of property and permits only the existence of one universal all inclusive single class of property within which the valuation for the assessment of ad valorem taxes must be the same for every kind of property, and this requirement of a universal all inclusive single class is in direct and irreconcilable conflict with its utterances in the foregoing series of cases beginning with *Charleston and Southside Bridge Company* v. *Kanawha County Court,* 41 W. Va. 658, 24 S. E. 1002,

error dismissed 168 U. S. 704, 18 S. Ct. 941, 42 L. Ed. 1212, decided in 1896, and including *In Re: Tax Assessments Against The Southern Land Company,* 143 W. Va. 152, 100 S. E. 2d 555, decided in 1957, which covers a period of sixty one years of the ninety six years of the existence of this State. Though none of those cases makes specific application of the "no one species" provision, this Court, being cognizant of that provision in upholding the constitutional validity of the assessed valuation in a particular class of property when such valuation was uniform, as it did in the cases of *Charleston and Southside Bridge Company* v. *Kanawha County Court,* 41 W. Va. 658, 24 S. E. 1002, error dismissed 168 U. S. 704, 18 S. Ct. 941, 42 L. Ed. 1212, and *In Re: Tax Assessments Against Charleston Federal Savings and Loan Association,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed *Charleston Federal Savings and Loan Association* v. *Alderson,* 324 U. S. 182, 65 S. Ct. 624, 89 L. Ed. 857, necessarily considered it to mean that no one species of property within a particular class should be valued higher than any other species of property in the same class and that it did not operate to prevent different valuations in different classes when the valuations in the same class were equal and uniform. If this Court had given that clause the meaning and effect now placed upon it by the majority decision in this case it would necessarily have reached a different conclusion as to the validity of the challenged valuations in each of the two above cited cases. By the prior decisions of this Court, during a period of almost two-thirds of the existence of this State, in which many of its distinguished former judges participated and in which it clarified the meaning of the "equal and uniform" provision of Article X, Section 1, it harmonized that provision with the "no one species" provision and avoided the apparently irreconcilable conflict between them which has resulted from the present decision and will inevitably give rise to perplexity and confusion in the administration of the long established system of taxation in this State.

Inasmuch as this Court in its decisions in the foregoing

series of cited cases was required to consider the meaning and effect of the "no one species" provision of Article X, Section 1, of the Constitution, and quoted that provision in its opinion in two of those cases, that question in the instant case was manifestly not one of first impression in this State even though the majority considered it to be a question of that nature.

The provisions that "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law" and that "No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value," have been a part of the Constitution since the formation of this State and each appeared, in the identical language just quoted, in Article VIII, Section 1, of the Constitution of 1863, and in Article X, Section 1, of the present Constitution adopted in 1872, and the same language remains in the same Article and Section notwithstanding the amendment to that Article and Section in November 1932 which authorized the division of all taxable property into four classes for the establishment of rates of taxation and imposed a limitation on the rate or amount of the tax which may be levied upon each class of property. The absence of any discussion of the provision that "No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value;" did not eliminate it from the Constitution or remove or impair its operation or effect. It can not be contended, with any show of sound reason or any degree of convincing persuasion that the several judges of this Court who participated in the decisions in the cases of *Charleston and Southside Bridge Company* v. *Kanawha County Court,* 41 W. Va. 658, 24 S. E. 1002, error dismissed 168 U. S. 704, 18 S. Ct. 941, 42 L. Ed. 1212, *West Penn Power Company* v. *Board of Review and Equalization of Brooke County,* 112 W. Va. 442, 164 S. E. 862, *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813, *In Re: Tax Assessments Against Hancock County Federal Savings and*

*Loan Association,* 125 W. Va. 426, 25 S. E. 2d 543, and *In Re: Tax Assessments Against Charleston Federal Savings and Loan Association,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed in *Charleston Federal Savings and Loan Association* v. *Alderson,* 324 U. S. 182, 65 S. Ct. 624, 89 L. Ed. 857, were unaware of the "no one species" clause, ignored its existence, or misunderstood its full and complete meaning and effect, or that all or any of those jurists were less capable of rendering a sound, just and correct decision of the question involved than the able and distinguished judges who constitute the majority in this case. On the contrary, the conclusion is inescapable that the judges who decided the above cited cases gave studied consideration to all the provisions of Article X, Section 1, and after mature deliberation adopted the view that the "no one species" clause did not render invalid or unconstitutional different valuations of property of different classes if the assessment of taxes within each of the different classes was equal and uniform.

It is pertinent to make particular mention of the seven prior decisions of this Court which the majority in the case at bar was required to disapprove in order to reach the conclusion that the assessment of the stock of the plaintiff at one hundred per cent of its true and actual value was violative of the "no one species" clause of the Constitution. In the first of these cases, *Charleston and Southside Bridge Company* v. *Kanawha County Court,* 41 W. Va. 658, 24 S. E. 1002, error dismissed 168 U. S. 704, 18 S. Ct. 941, 42 L. Ed. 1212, decided in 1896, the opinion in which was written by Judge English, the decision was concurred in by the other three members of this Court who were Judges Holt, Brannon and Dent, although Judges Brannon and Dent filed separate concurring opinions. In the second case, *Christopher* v. *James,* 122 W. Va. 665, 12 S. E. 2d 813, decided in 1940, the opinion in which was written by Judge Maxwell, the decision was concurred in by the four other members of this Court who were Judges Riley, Hatcher, Kenna and Fox. In the third case, *In re: Tax Assessments Against Hancock Federal Savings and Loan Association,* 125 W.

Va. 426, 25 S. E. 2d 543, decided in 1943, the opinion in which was written by Judge Fox, the decision was concurred in by two of the four members of this Court who were Judges Kenna and Lovins with the two remaining members Judges Riley and Rose filing separate dissenting opinions. In the fourth case, *In Re: Tax Assessments Against Charleston Federal Savings and Loan Association,* 126 W. Va. 506, 30 S. E. 2d 513, affirmed in *Charleston Federal Savings and Loan Association* v. *Alderson,* 324 U. S. 182, 65 S. Ct. 624, 89 L. Ed. 857, decided in 1944, the opinion in which was written by Judge Fox, the decision was concurred in by the other four members of this Court who were Judges Riley, Rose, Kenna and Lovins. In the fifth case, *Bankers Pocahontas Coal Company* v. *County Court of McDowell County,* 135 W. Va. 174, 62 S. E. 2d 601, decided in 1950, the opinion in which was written by Judge Lovins, the decision was concurred in by the other four members of this Court who were Judges Fox, Riley, Haymond and Given. In the sixth case, *In Re: Tax Assessments Against The National Bank of West Virginia at Wheeling and The Morris Plan Savings and Loan Company,* 137 W. Va. 673, 73 S. E. 2d 655, decided in 1952, the opinion in which was written by Judge Given, the decision was concurred in by the other four members of this Court who were Judges Riley, Lovins, Haymond and Browning. And finally, in the seventh of these cases, *In re: Tax Assessments Against The Southern Land Company,* 143 W. Va. 152, 100 S. E. 2d 555, decided in 1957, the opinion in which was written by Judge Riley, the decision was concurred in by the other four members of this Court who were Judges Haymond, Given, Browning and Ducker. In those seven cases, which are now disapproved, fifteen of the forty nine judges of this Court since the formation of this State in 1863, have held or entertained the view that classifications for the valuation of taxable property of different types or classes were valid and constitutional under the provisions of Article VIII, Section 1, of the Constitution of 1863 and of Article X, Section 1, of the present Constitution that

"taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value," provided the valuation within each particular class was uniform and equal. Now the views and the conclusions of all these former and present judges of this Court are summarily disapproved and rejected by the decision of a majority consisting of three judges, two of whom participated and concurred in the decision in the case of *In re: Tax Assessments Against The Southern Land Company,* 143 W. Va. 152, 100 S. E. 2d 555, in which the opinion states that "Subject to the limitations, governing the jurisdiction of this Court, the question before us is raised by Article X, Section 1, of the West Virginia Constitution, which reads: 'Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value * * *.' This requirement of equality and uniformity of taxation, as set forth in Article X, Section 1 of the West Virginia Constitution, means that as to all classes of property, business or incomes there shall be uniformity of taxation." I can not concur in or approve the decision of the majority which accomplishes that surprising and to me wholly unwarranted result.

The history of the incorporation in the Constitution of 1863 of the "no one species" provision and the reason for its adoption militate against and do not support the conclusion reached by the majority in this case. Prior to and at the time of the formation of this State the Constitution of Virginia of 1851, in Article IV, Sections 22 and 23, contained these provisions: "Taxation shall be equal and uniform throughout the commonwealth, and

all property other than slaves shall be taxed in proportion to its value, which shall be ascertained in such manner as may be prescribed by law." And "Every slave who has attained the age of twelve years shall be assessed with a tax equal to and not exceeding that assessed on land of the value of three hundred dollars. Slaves under that age shall not be subject to taxation; and other taxable property may be exempted from taxation by the vote of a majority of the whole number of members elected to each house of the general assembly." This constitutional limitation on the valuation of slaves and the provision for exemption from taxation of other taxable property by the vote of a majority of the whole number of members elected to each house of the general assembly and the inadequate and unequal representation in each house of the inhabitants of the western counties of Virginia which subjected them to the policies supported by the eastern counties caused violent and bitter dissatisfaction to the people of the western counties where there were fewer slaves than in the eastern counties and required them to pay higher taxes upon other types of personal property than the taxes paid upon slaves by their owners. These inequalities were among the main causes that led to the separation of the western and the eastern sections of the commonwealth and resulted in the formation of this State in 1863. See Vol. 1, Debates and Proceedings of the First Constitutional Convention of West Virginia, pages 5 and 6, and Vol. III, page 55. The main purpose of the proponents of the "no one species" clause in causing its incorporation in the Constitution of 1863, as disclosed by the debates of that convention, was to prevent any constitutional limitation of the value for the assessment of taxes of a particular type or species of property to the exclusion of all other types or species of property such as the limitation of the valuation of slaves in the Virginia Constitution which had provoked their bitter and undying opposition. Some members of the Convention were of the opinion that the "no one species" clause did not affect the meaning and effect of the "equal and uniform" clause but

amounted to mere repetition of that provision. See Vol. III, Debates and Proceedings of the First Constitutional Convention of West Virginia, remarks of Mr. Brown, page 56, remarks of Mr. Stuart, page 67, remarks of Mr. Paxton, pages 56 and 68, remarks of Mr. Smith, page 68, remarks of Mr. Sinsel, page 72, and remarks of Mr. Irvine, pages 64 and 74. It is clear that it was not the intention of those who voted for the adoption of the "no one species" clause that it would ever be the instrument or afford the means of reducing the value of all taxable property of every naturally different class or type to the lowest valuation brought about by "a systematic plan" to assess property at forty per cent or any other specified percentage of its true and actual value, and of prohibiting the assessment of other classes of property at different valuations provided the valuation in each class is equal and uniform. Precisely that result, however, has been accomplished by the decision of the majority in this case.

If the "no one species" clause is now to be used to reduce the valuation of all property to the level recognized by "a systematic plan" to assess property at a specified percentage of its true and actual value to the exclusion of different valuations of different classes of property which are equal and uniform within each class, which, as I understand the majority decision, is the result which it requires, the value of the stock of the plaintiff should be reduced, not to forty per cent of its true and actual value, but instead to twenty per cent of its true and actual value to conform to the "systematic plan" followed by the assessor of Kanawha County who has actually assessed machinery and equipment at a valuation based upon twenty per cent of their original cost. And this principle must necessarily apply under the "equal and uniform" clause to the valuation of property in every county of this State.

In my opinion the present decision will inevitably result in confusion and uncertainty in the valuation of the property of utilities which own property and operate in

more than one county in this State. If a public service corporation operates in Kanawha County and in several other counties in this State the valuation of its property in that county must be reduced to conform to the "systematic plan" to assess property at forty per cent of its true and actual value or it will be subjected to an unconstitutional discrimination if its property is assessed above that percentage of its true and actual value. If its property in some other county where "a systematic plan" to assess property at sixty per cent of its true and actual value exists its property must be assessed at that percentage and it will be subjected to an unconstitutional discrimination in that county if it is assessed at any greater percentage of its true and actual value. But if its property in Kanawha County is and must be asessed at forty per cent of its true and actual value and its property in another county to conform to the "systematic plan" is and must be assessed at sixty per cent of its true and actual value, the taxation of its property which by the "equal and uniform" clause must be equal and uniform throughout the State will not be equal and uniform and under that provision will be invalid because in violation of that clear and express provision, for manifestly an assessment can not be constitutional and valid under the "no one species" clause if it is violative of the "equal and uniform" clause of the same Article and Section of the Constitution. In fact, under the decision of the majority, the property of any utility in several counties of this State, to comply with the "equal and uniform" clause which requires taxation to be equal and uniform, not in any one county but "throughout the State," must be reduced in valuation to the lowest valuation of property in Kanawha County which as to machinery and equipment is twenty per cent of their true and actual value based on that percentage of their original cost.

As heretofore pointed out, the present decision, instead of harmonizing the "equal and uniform" provision and the "no one species" provision in Article X, Section 1, of the Constitution, has rendered them apparently

repugnant to each other and created an apparent irreconcilable conflict between them. In accomplishing that unnecessary and unfortunate result, the majority has disregarded an elementary canon of constitutional construction which requires that if there is an apparent repugnancy between different constitutional provisions it is the duty of the court to harmonize them if possible. In 11 Am. Jur., Constitutional Law, Section 53, the text contains these statements: "In construing a constitutional provision, it is the duty of the court to have recourse to the whole instrument, if necessary, to ascertain the true intent and meaning of any particular provision, and if there is an apparent repugnancy between different provisions, the court should harmonize them if possible. The rules of construction of constitutional law require that two sections be so construed, if possible, as not to create a repugnancy, but that both be allowed to stand, and that effect be given to each." In 16 C.J.S., Constitutional Law, Section 23, the rule is discussed in these terms: "In ascertaining both the intent and general purpose, as well as the meaning, of a constitution or a part thereof, it should be construed as a whole. As far as possible, each provision should be construed so as to harmonize with all the others, with a view to giving effect to each and every provision in so far as it shall be consistent with a construction of the instrument as a whole." In *State* v. *Harden,* 62 W. Va. 313, 58 S. E. 715, this Court held in point 3 of the syllabus that "In ascertaining the intention of the people in adopting a constitution all parts of the constitution must be considered, every article, section, clause, phrase and word allowed some effect, and all parts, clauses, phrases and words harmonized, if possible. No part or word in it can be ignored, disregarded, treated as meaningless or denied purpose and effect, unless there be irreconcilable contradiction and repugnancy." In *Berry* v. *Fox,* 114 W. Va. 513, 172 S. E. 896, quoting from Cooley's Constitutional Limitations, 8th Edition, Vol. 1, page 129, this Court said that an amendment to the constitution and all its other provisions must, if possible, be harmonized. See also *Flesher* v. *Board of*

*Review, West Virginia Department of Veterans' Affairs,*
138 W. Va. 765, 77 S. E. 2d 890.

It should be emphasized that, until the present decision, the prior decisions of this Court have consistently been considered binding authority to be followed and adhered to unless such prior decisions are found to be plainly erroneous or utterly unsound. By expressly disapproving the seven prior decisions of this Court cited and referred to earlier in this dissenting opinion, the majority has departed from that salutary and well established principle. Instead of adopting the reasons set forth and the conclusions reached by this Court in those decisions, the majority seeks to sustain its present decision by citing and relying upon numerous decisions by courts in other jurisdictions in disregard of the rule that such decisions should be accorded only persuasive but not controlling force and effect. I am unwilling to ignore the decisions of this Court and instead to apply the decisions to the contrary of the courts of other jurisdictions in the consideration and disposition of any case by this Court.

In my judgment, the present decision requiring all types of property, regardless of the natural diversities between them, to be placed in a single, universal and all inclusive class and to be given the same percentage of value for the assessment of ad valorem taxes, accomplishes the amazing and heretofore unheard of result of completely and permanently abolishing any classification of the different kinds of property into separate and distinct categories for the purpose of assessing ad valorem taxes against inherently different types of property in this State; and this result is accomplished by a bare majority consisting of three judges of this Court in the face of a heretofore unbroken line of well considered cases in which this Court reached an opposite and entirely different conclusion. Under the present decision, money, bills and notes, evidence of indebtedness, oil wells, railroad systems and equipment, shares of stock, livestock, farm machinery, merchandise, coal mines, house-

hold furniture, jewelry, automobiles, steamboats, race-horses, real estate of all kinds, and even poodle dog pets must be given the same percentage of value and can not be placed in separate or distinct classes, despite the natural differences between them, or valued equally and uniformly within the class in which some or any of the foregoing items may directly and properly belong for the assessment of the ad valorem taxes to which they are subject under the law of this State. I do not and can not subscribe to any such previously unheard of, chaotic and utterly impractical innovation in the system of taxation in this State.

As previously indicated the present decision is logically inconsistent and legally unsound. The assessed valuations in the cases of *Charleston and Southside Bridge Company* v. *Kanawha County Court*, 41 W. Va. 658, 24 S. E. 1002, error dismissed 168 U. S. 704, 18 S. Ct. 941, 42 L. Ed. 1212, *In Re: Tax Assessments Against Hancock County Federal Savings and Loan Association*, 125 W. Va. 426, 25 S. E. 2d 543, and *In Re: Tax Assessments Against Charleston Federal Savings and Loan Association*, 126 W. Va. 506, 30 S. E. 2d 513, affirmed *Charleston Federal Savings and Loan Association* v. *Alderson*, 324 U. S. 182, 65 S. Ct. 624, 89 L. Ed. 857, and *In Re: National Bank of West Virginia*, 137 W. Va. 673, 73 S. E. 2d 655, can not be valid and constitutional, as this Court held them to be in those cases, and at the same time be invalid and unconstitutional as violative of the "no one species" provision of Article X, Section 1, as they must be under that provision as applied to the valuation of the stock of the plaintiff in this case and, by the same norm, the valuation of that stock can not be valid and constitutional, as it is under the above cited cases, because of its uniformity within that class of property, and at the same time be invalid and unconstitutional under the "no one species" provision as applied by the majority in its decision of the instant case. In brief an assessed valuation of property for the collection of ad valorem taxes can not be valid and constitutional under the "equal

and uniform" provision, as heretofore applied by this Court, and at the same time be invalid and unconstitutional under the "no one species" provision of Article X, Section 1, of the Constitution of this State as now applied by the majority in the decision of this case.

For the reasons stated and under the authorities cited and quoted from in this dissent I would adhere to the former decisions of this Court and affirm the action of the circuit court in assessing the stock of the plaintiff at one hundred per cent of its true and actual value of $6,000,000.00.

I am authorized to state that Judge BERRY concurs in the views expressed in this dissenting opinion.